#25974 - #25983-a-SLZ
**2012 S.D. 63**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA
* * * *
(#25974)

TERESA BERNIE,                                    Plaintiff and Appellant,

v.

CATHOLIC DIOCESE OF SIOUX FALLS,                 Defendant and Appellee,

and

BLUE CLOUD ABBEY; DOE PRIEST;
SISTERS OF THE BLESSED SACRAMENT;
OBLATE SISTERS OF THE BLESSED
SACRAMENT; DOE PERPETRATOR 1; DOE
PERPETRATOR 2; DOE PERPETRATOR
3; and DOE PERPETRATOR 4,                         Defendants.

-------------------------------------------------------------------------------------------------------------------
(#25975)

GALEN DRAPEAU,                                    Plaintiff and Appellant,

v.

CATHOLIC DIOCESE OF SIOUX FALLS,                 Defendant and Appellee,

and

BLUE CLOUD ABBEY; FR. FRANCIS;
OBLATE SISTERS OF THE BLESSED
SACRAMENT; SR. FRANCIS; SR. M.
AGNES; AND MOE SHEVELIN,                          Defendants.

* * * *
APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *
THE HONORABLE BRADLEY G. ZELL
Judge

* * * *

ARGUED ON MAY 22, 2012
OPINION FILED **09/05/12**

---------------------------------------------------------------------------------
(#25976)

L.C.A.; J.C.B.; L.J.C.; G.D.; B.C.D.;
R.B.; M.L.B.; F.B.C.; Y.P.C.,                          Plaintiffs and Appellants,

v.

CATHOLIC DIOCESE OF SIOUX FALLS,                      Defendant and Appellee,

and

BLUE CLOUD ABBEY; FR. FRANCIS;
OBLATE SISTERS OF THE BLESSED
SACRAMENT; SR. FRANCIS; FR. GEORGE;
FR. LEO; DOE PRIEST; SISTERS OF THE
BLESSED SACRAMENT; SR. M. DAVIDICA;
SR. M. THEOPHANE; SR. ELETA MARIE;
SR. M. BAPTISTA; OBLATE SISTERS OF
THE BLESSED SACRAMENT; SR. JOHN
MARIE; SR. AGNES; BENNY LEE;
MOE SHEVELIN,                                          Defendants.

---------------------------------------------------------------------------------
(#25977)

MARY MCGHEE DOG SOLDIER,                               Plaintiff and Appellant,

v.

CATHOLIC DIOCESE OF SIOUX FALLS,                      Defendant and Appellee,

and

BLUE CLOUD ABBEY,                                     Defendant.

---------------------------------------------------------------------------------
(#25978)

ALFRED EAGLE DEER, SR.,                               Plaintiff and Appellant,

v.

CATHOLIC DIOCESE OF SIOUX FALLS,                      Defendant and Appellee,

and

OBLATE SISTERS OF THE BLESSED
SACRAMENT,                                            Defendant.

---

(#25979)

| | |
|---|---|
| RITA FAYE FLOOD, | Plaintiff and Appellant, |
| v. | |
| CATHOLIC DIOCESE OF SIOUX FALLS, | Defendant and Appellee, |
| and | |
| BLUE CLOUD ABBEY, | Defendant. |

---

(#25980)

| | |
|---|---|
| GROVER CURTIS MALLORY, | Plaintiff and Appellant, |
| v. | |
| CATHOLIC DIOCESE OF SIOUX FALLS, | Defendant and Appellee, |
| and | |
| SISTERS OF THE BLESSED SACRAMENT, | Defendant. |

---

(#25981)

| | |
|---|---|
| RODERICA ROUSE, | Plaintiff and Appellant, |
| v. | |
| CATHOLIC DIOCESE OF SIOUX FALLS, | Defendant and Appellee, |
| and | |
| BLUE CLOUD ABBEY, | Defendant. |

---

(#25982)

| | |
|---|---|
| LOREN RAYMOND ZEPHIER, | Plaintiff and Appellant, |
| v. | |
| CATHOLIC DIOCESE OF SIOUX FALLS, | Defendant and Appellee, |
| and | |
| BLUE CLOUD ABBEY, | Defendant. |

-------------------------------------------------------------------------------------------------

(#25983)

ISADORE M. ZEPHIER,                                   Plaintiff and Appellant,

v.

CATHOLIC DIOCESE OF SIOUX FALLS,          Defendant and Appellee,

and

BLUE CLOUD ABBEY,                                    Defendant.


* * * *

(#25974 — #25983)

REBECCA L. RHOADES of
Manly & Stewart
Newport Beach, California

and

MICHAEL SHUBECK
GREGORY A. YATES
Rapid City, South Dakota                          Attorneys for plaintiffs and
                                                              appellants.


JAMES E. MCMAHON
ROCHELLE SWEETMAN of
Murphy, Goldammer & Prendergast, LLP
Sioux Falls, South Dakota                         Attorneys for defendant and
                                                              appellee.

ZINTER, Justice

[¶1.]    A number of former students who attended a boarding school alleged that they had been sexually abused while attending the school. They sued some of the alleged perpetrators and four entity defendants, including the Catholic Diocese of Sioux Falls.[1] The circuit court granted summary judgment in favor of the Diocese on all three of the students' substantive claims. We affirm.

*Facts and Procedural History*

[¶2.]    These cases arise from alleged acts of sexual abuse at St. Paul's School in Marty, which is located on the Yankton Sioux Reservation. The creation of the school can be traced to 1921, when St. Meinrad Archabbey, a religious order of Benedictine monks located in Indiana, sent Father Sylvester Eisenman to the Dakotas. The school was founded around 1922 by a combination of efforts of Father Eisenman, the Sisters of the Blessed Sacrament,[2] and the Bureau of Catholic Indian Missions (BCIM).[3] We have not been provided with any evidence that the

---

1.    The students did not sue the school, which was incorporated as "St. Paul's Indian Mission Corporation." The students' suits against the other entity defendants are the subject of the appeals in *Bernie v. Blue Cloud Abbey et al.*, ___ S.D. ___, ___ N.W.2d ___. In those appeals, we conclude that these suits are barred because an extended statute of limitations for childhood sexual abuse (SDCL 26-10-25) does not apply to the entity defendants. That issue was not preserved for appellate review in these appeals involving the Diocese.

2.    The Sisters of the Blessed Sacrament is a religious order of women based in Philadelphia, Pennsylvania. The order was founded in 1891.

3.    The BCIM was created in 1874 under the direction of the Archbishop of Baltimore for the protection and promotion of Catholic Indian mission interests in the United States. The United States government was overseeing the internal and external relations of Native Americans, and in

(continued . . .)

Diocese[4] was involved in the creation of the school.

[¶3.]     Father Eisenman and other monks from St. Meinrad Archabbey staffed the school until approximately October 1954.  At that time, Blue Cloud Abbey, a religious order of Benedictine monks founded by (but separate from) St. Meinrad Archabbey, assumed responsibility for the school.  The Sisters of the Blessed Sacrament also provided staffing for the school until 1954, when the Oblate Sisters of the Blessed Sacrament[5] began providing teachers, staff, and volunteers.

[¶4.]     In 1955, title to the school was transferred from the BCIM to St. Paul's Indian Mission Corporation, a South Dakota non-profit corporation organized by Blue Cloud Abbey.  According to the bylaws, membership in St. Paul's Indian Mission Corporation consisted of "those persons who have made Solemn Vows for Blue Cloud Abbey, and who are residing and have been appointed by the Abbot of Blue Cloud to reside at St. Paul's Indian Mission."[6]  There is no evidence that any

_____

(. . . continued)
     order to interact with Native Americans, the Catholic Church was required to work through federal government channels.  To facilitate its mission with Native Americans, the Catholic Church established a single entity in Washington D.C., the BCIM, to serve as the channel through which various Catholic organizations could petition the United States Indian Office.

4.     The Diocese is a South Dakota non-profit corporation.

5.     The Oblate Sisters of the Blessed Sacrament was founded by the Sisters of the Blessed Sacrament in 1949 as an all Indian religious order at St. Paul's Mission.  The Oblate Sisters of the Blessed Sacrament is, however, a separate corporation incorporated under the laws of South Dakota.

6.     The bylaws also provided that "[t]he board of Directors, of which the elected Abbot of Blue Cloud Abbey is ex-officio a member, shall consist of four members, of which the Abbot of Blue Cloud is one."  Board positions were to be filled from qualified members of the corporation.  The Abbot of Blue Cloud

(continued . . .)

employee of the Diocese ever acted as an officer, director, or employee of St. Paul's Indian Mission Corporation. In 1975 and 1976, St. Paul's Indian Mission Corporation transferred ownership and operation of the school to the Yankton Sioux Tribe.

[¶5.] Between 2004 and 2008, former students of St. Paul's School commenced lawsuits against the Diocese, Blue Cloud Abbey, the Sisters of the Blessed Sacrament, and Oblate Sisters of the Blessed Sacrament. The students also sued a number of the alleged perpetrators. The alleged perpetrators included nuns from the Oblate Sisters of the Blessed Sacrament and the Sisters of the Blessed Sacrament, as well as monks and priests from Blue Cloud Abbey.[7] No claims were asserted against Diocesan priests, employees, or volunteers. Nevertheless, the students alleged that the Diocese was vicariously liable for the other defendants' actions under the doctrine of respondeat superior. The students also alleged the Diocese was directly liable under theories of breach of fiduciary duty and negligence in failing to properly hire, train, and supervise those who worked at the school. All abuse was alleged to have occurred before the Yankton Sioux Tribe acquired ownership and control of the school in 1975 and 1976.

_____

(. . . continued)
    Abbey was the ex-officio president of the board of directors, and the bylaws provided that "[t]he Abbot shall preside at all meetings of the members and of the board of directors, and shall perform all other duties ordinarily incident to the office of President."

7.     Father George Lyon testified (by deposition) that the only Catholic priests at the school were Benedictine monks.

[¶6.]     After a prior appeal and remand from this Court, *see Zephier v. Catholic Diocese of Sioux Falls*, 2008 S.D. 56, 752 N.W.2d 658, the circuit court granted summary judgment in favor of the Diocese on all substantive and some procedural issues.  Substantively, the court ruled that the Diocese was not vicariously liable for the acts of the other defendants on the theory of respondeat superior.  The court concluded that, assuming the Diocese was the principal, the alleged perpetrators were not acting within the scope of their agency or employment.  With respect to direct liability for negligence and breach of fiduciary duty, the court ruled that the Diocese owed no duty to the students.  The court reasoned that the Diocese did not exercise the extent of control over the other defendants necessary to establish an agency relationship that imposed a duty to the students.  Because these substantive issues are dispositive, we do not address the numerous other rulings that have been raised by appeal and notice of review.

## Decision

[¶7.]     We review the circuit court's grant of summary judgment to "determine whether the moving party has demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law." *Dykstra v. Page Holding Co.*, 2009 S.D. 38, ¶ 23, 766 N.W.2d 491, 496.  We view the evidence most favorably to the students and resolve reasonable doubts against the Diocese. *See id.*  The students, however, "must present specific facts showing that a genuine, material issue for trial exists." *See id.*  "Entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial." *One Star v. Sisters of St. Francis*, 2008 S.D. 55, ¶ 9, 752 N.W.2d 668, 674.

*Respondeat Superior*

[¶8.]       Respondeat superior is "a legal fiction designed to bypass impecunious individual tortfeasors for the deep pocket of a vicarious tortfeasor." *Bass v. Happy Rest, Inc.*, 507 N.W.2d 317, 320 (S.D. 1993).  Under the doctrine of respondeat superior, an employer or principal may be held liable for "the employee's or agent's wrongful acts committed within the scope of the employment or agency." *Hass v. Wentzlaff*, 2012 S.D. 50, ¶ 20, 816 N.W.2d 96, 102-03.

[¶9.]       In determining whether an intentional tort is within the scope of employment, this Court uses a two-prong test: whether the purpose of the act was to serve the principal and whether the act was foreseeable. *Id.* ¶ 21.  Under the first prong, a "principal may be liable for an agent's acts where the agent's 'purpose, however misguided, is wholly or in part to further the [principal's] business[.]'" *Id.* ¶ 23 (quoting *Kirlin v. Halverson*, 2008 S.D. 107, ¶ 22, 758 N.W.2d 436, 447).  An act furthers the principal's business if it carries out the objectives of the employment.

> "[W]ithin the scope of employment" has been called vague but flexible, referring to "those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment."

*Kirlin*, 2008 S.D. 107, ¶ 12, 758 N.W.2d at 444 (quoting *Deuchar v. Foland Ranch, Inc.*, 410 N.W.2d 177, 180 (S.D. 1987) (quoting *Prosser and Keeton on the Law of Torts* § 70, at 502 (5th ed. W. Page Keeton 1984))).  "But if [the agent] acts from

purely personal motives . . . he is considered in the ordinary case to have departed from his employment and the [principal] is not liable." *Hass*, 2012 S.D. 50, ¶ 23, 816 N.W.2d at 103 (alterations in original). Therefore, it must first be determined whether the act was wholly motivated by the agent's personal interests. If the agent acted with intent to serve solely his own interest, the act is not within the scope of employment and the principal is not liable. Liability does, however, attach if "the act had a dual purpose, that is, to serve the [principal] and to further personal interests." *Id.* ¶ 21.

[¶10.] The students argue that the perpetrators were acting in furtherance of the Diocese's business by acting as teachers and caregivers in performing boarding school duties. Relying on *Fearing v. Bucher*, 977 P.2d 1163 (Or. 1999), the students contend that the alleged sexual acts were within the scope of employment because the acts were performed by the alleged perpetrators "as a result of their positions" as priests, nuns, and teachers at the school. The students contend that under *Fearing,* the Diocese may be vicariously liable because, as a result of the perpetrators' positions of trust and confidence, they obtained the opportunity to be alone with the students and abuse them.

[¶11.] We disagree with the *Fearing* court's view of respondeat superior liability in these types of sexual abuse cases. In *Fearing*, a youth pastor, who was an employee of the archdiocese, committed a series of sexual assaults on a minor. *Id.* at 1165. The court considered the sufficiency of the complaint to withstand a motion to dismiss. The court concluded that although "sexual assaults . . . clearly [are] outside the scope of . . . employment," the vicarious liability inquiry does not

end with that determination. *Id.* at 1166. The court applied an Oregon exception to the general rule of nonliability for acts committed outside the scope of employment. The *Fearing* court stated that the principal "still could be found vicariously liable, if acts that were within [employee's] scope of employment 'resulted in the acts which led to injury to [the] plaintiff.'" *Id.* (quoting *Chesterman v. Barmon*, 753 P.2d 404, 406 (Or. 1988) (en banc)). The court noted the complaint alleged that the pastor "used his position as youth pastor," and by virtue of that relationship, the pastor "gained the opportunity" to sexually assault the child. *Id.* The court concluded that "a jury could infer that the sexual assaults were the culmination of a progressive series of actions that began with and continued to involve [the pastor's] performance of the ordinary and authorized duties of a priest." *Id.* at 1167.

[¶12.] Most courts do not, however, follow Oregon's exception to the general rule of nonliability in cases involving an ecclesiastical officer's sexual abuse. *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d 712, 729 (Tenn. Ct. App. 2008). *Diocese of Memphis* acknowledged the *Fearing* exception when the tortfeasor-employee "use[s] his employment to commit the tort." *Id.* But *Diocese of Memphis* observed that "[n]otwithstanding the fact that allegations of a cleric's sexual misconduct often include situations where the cleric used his or her position in the Church to gain the trust of and access to a victim, most courts have been unwilling to apply this exception to clergy sexual abuse cases." *Id.* (quoting Jana Satz Nugent, Note, *A Higher Authority: the Viability of Third Party Tort Actions Against a Religious Institution Grounded on Sexual Misconduct by a Member of the Clergy*, 30 Fla. St. U. L. Rev. 957, 968 (2003)). *See also Tichenor v. Roman Catholic Church*

*of the Archdiocese of New Orleans,* 32 F.3d 953, 959 (5th Cir. 1994) (rejecting the argument that the sexual acts were sufficiently "connected in time, place, and causation to [the perpetrator's] duties as a Catholic priest as to warrant the imposition of vicarious liability"). "It would be hard to imagine a more difficult argument than that [a priest's] illicit sexual pursuits were somehow related to his duties as a priest or that they in any way furthered the interests of . . . his employer." *Tichenor,* 32 F.3d at 960.

[¶13.] Generally, it is a question of fact for the jury whether an intentional tort is within the scope of employment. *Kirlin,* 2008 S.D. 107, ¶ 16, 758 N.W.2d at 445. "But there are occasional cases where [an agent's] digression from duty is so clear-cut that the disposition of the case becomes a matter of law." *Doe v. Norwich Roman Catholic Diocesan Corp.,* 268 F. Supp. 2d 139, 142 (D. Conn. 2003) (quoting *A-G Foods Inc. v. Pepperidge Farm, Inc.,* 579 A.2d 69, 73 (Conn. 1990)). And in most cases, courts conclude that sexual abuse by priests represents such a far deviation from furthering a church or diocese's business, and is such a clear-cut digression from an employee's duty, that it is, as a matter of law, outside the scope of employment. *Id.* Indeed, "the majority of jurisdictions considering the issue of sexual contact between an ecclesiastic officer and a parishioner have held that the act is outside the scope of employment as a matter of law." *N.H. v. Presbyterian Church (U.S.A.),* 998 P.2d 592, 599 (Okla. 1999). Simply stated, a priest's sexual relation with a parishioner is a substantial departure from the priest's duties and not within the church's business.

> Ministers should not molest children. When they do, it is not a
> part of the minister's duty nor customary within the business of

> the congregation. . . . No reasonable person would conclude that [a minister's] sexual misconduct was within the scope of employment or in furtherance of the [church's] business.

*Id.* *See also Tichenor*, 32 F.3d at 960 ("[G]iven [the perpetrator-priest's] vow of celibacy and the Catholic Church's unbending stand condemning homosexual relations, [the priest's illicit sexual] acts represent the paradigmatic pursuit of 'some purpose unrelated to his master's business.'"); *Moses v. Diocese of Colorado*, 863 P.2d 310, 330 (Colo. 1993) ("Such [sexual] conduct is contrary to the principles of Catholicism and is not incidental to the tasks assigned a priest by a diocese."); *Destefano v. Grabrian*, 763 P.2d 275, 287 (Colo. 1988) ("A priest's violation of his vow of celibacy is contrary to the instructions and doctrines of the Catholic church. When a priest has sexual intercourse with a parishioner it is not part of the priest's duties nor customary within the business of the church."); *A.L.M. v. Diocese of Allentown,* 68 Pa. D. & C.4th 111, 124-25 (Pa. Ct. Com. Pl.) (concluding that under Pennsylvania law, the offending priest's sexual abuse would have been deemed outside the scope of employment).[8]

[¶14.] We conclude that the alleged acts of sexual abuse in this case were solely in the perpetrators' own interests and were not in furtherance of the pursuit of any Diocesan business. This ends our inquiry and we need not consider whether the abuse was foreseeable. Because the alleged acts were not within the

---

8. The students identify one type of act by Father Francis Suttmiller—abuse in "disciplining" children—that they argue was in furtherance of school business. However, Father Francis was a member of Blue Cloud Abbey. As we later explain, *infra* ¶¶ 17-19, the students failed to establish that Father Francis or Blue Cloud Abbey were in an agency relationship with the Diocese to operate this school for the Diocese. Therefore, there was no agency or employment relationship upon which vicarious liability could attach.

perpetrators' scope of agency or employment, the circuit court did not err in granting summary judgment in favor of the Diocese on the students' respondeat superior claims.

*Negligence and Breach of Fiduciary Duty*

[¶15.]     "In order to prevail in a suit based on negligence, a plaintiff must prove duty, breach of that duty, proximate and factual causation, and actual injury." *Highmark Fed. Credit Union v. Hunter*, 2012 S.D. 37, ¶ 9, 814 N.W.2d 413, 415.  The duty required is the "duty on the part of the defendant to protect a plaintiff from injury." *Clausen v. Aberdeen Grain Inspection*, 1999 S.D. 66, ¶ 11, 594 N.W.2d 718, 721.

[¶16.]     Generally, there is no duty to "control the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection." *Kirlin*, 2008 S.D. 107, ¶ 33, 758 N.W.2d at 449.  Therefore, to prove negligence, the students must have established that the Diocese had a special relationship with the alleged perpetrators that imposed a duty to control the perpetrators' actions while working at the school.  Alternatively, the students must have established that the Diocese had a special relationship with the students that imposed a duty of protection.  The existence of a duty is a question of law we review de novo.  *First Am. Bank & Trust, N.A. v. Farmers State Bank of Canton*, 2008 S.D. 83, ¶ 13, 756 N.W.2d 19, 26.

[¶17.]    The students argue that the requisite special relationship existed between the Diocese and the perpetrators.  The students' argument is based on agency.  They contend that an agency relationship arose because the Diocese exercised significant control over the school, the other entities, and the alleged perpetrators.  The students contend that the school could not have opened or remained in operation without the permission of the Bishop, and no Blue Cloud Abbey monk could function as a priest within the Diocese's geographic boundaries without the permission of the Diocese's Bishop.  The students also contend that the Bishop is the immediate ecclesiastical superior of the Sisters, and the Sisters obtained "permission" from the Diocese to proceed with the formation and operation of the school in the 1920s and 1930s.  The students contend that at the very least, there is a disputed issue of material fact about the matter.  They rely on the affidavit of Father Thomas Doyle, an expert on Canon Law and sex abuse cases, who opined on the relationship among entities, orders, and missions in the Catholic Church.  Father Doyle further opined on a bishop's "authority" and "control" over "pastoral and ministerial activities" of Catholic entities, which included schools operating in a diocese.

[¶18.]    To establish an agency relationship there must be a "(1) manifestation by the principal that the agent shall act for him, (2) the agent's acceptance of the undertaking, and (3) the understanding of the parties that the principal is to be in control of the undertaking." *A.P. & Sons Constr. v. Johnson*, 2003 S.D. 13, ¶ 23, 657 N.W.2d 292, 297.  In this case, even if we were to consider Father Doyle's opinions

on the Canon Law regarding the authority and control of a bishop in a diocese,[9] the students did not identify evidence establishing the three secular requirements of an agency relationship. The students did not show a manifestation by the Diocese that the perpetrators, Blue Cloud Abbey, the Oblate Sisters, or the Sisters of the Blessed Sacrament were to operate this school *for the Diocese*. Further, the students presented no evidence that the defendants accepted a Diocesan offer to operate the school for the Diocese. And even if the first two elements could be inferred, the students identified no evidence of an understanding among the defendants that the Diocese was to be controlling the operation of this school.

[¶19.]    Instead, the undisputed evidence reflects that the school was founded in 1922 as a mission of St. Meinrad Archabbey and the Sisters of the Blessed Sacrament. Later, it became the mission of Blue Cloud Abbey and the Oblate Sisters of the Blessed Sacrament. Further, the school was incorporated by Blue Cloud Abbey prior to any alleged act of abuse, and only Abbey members were members and officers of the corporation. Ultimately, there is no evidence of any manifestations by the Diocese or the other defendants that this school was to be operated by the entity defendants for the Diocese and that the Diocese would be in control of the undertaking. Concededly, the Diocese had ecclesiastical authority and control over matters such as liturgy, removing a priest, granting "faculties," performing canonical visitations, and disallowing the transfer of a nun. But simply

---

9. The Diocese contends, and the circuit court concluded, that Father Doyle's opinions may not be considered by courts because the opinions relate to ecclesiastical matters that would, under the First Amendment, impermissibly entangle this Court in church doctrine. In light of our analysis, we need not decide that question.

possessing such ecclesiastical authority and control is not a manifestation of an agency agreement. Notwithstanding Diocesan ecclesiastical authority and control over Catholic religious orders and their members, the students failed to establish an actual agency relationship between this Diocese and these defendants to undertake the operation of this school for the Diocese.[10] Therefore, the students failed to establish their alleged agency relationship between the Diocese and the other defendants that imposed a Diocesan duty to control the employees and volunteers who worked for St. Paul's Indian Mission Corporation.

[¶20.]     The students alternatively argue that the Diocese had a special relationship with the students that created a duty of protection. They contend that the Diocese acted *in loco parentis* and that such a relationship gave rise to the duty of protection. *See E.H. v. M.H.*, 512 N.W.2d 148, 149 n.* (S.D. 1994) ("The phrase 'in loco parentis' refers to a person who has put himself or herself in the situation of a lawful parent by assuming the obligations incident to the parental relationship

---

10.     The students also argue that there was a genuine issue of material fact whether ostensible agency was established. The students contend that the Diocese "clearly acted as the principal to the other entity defendants," and the Diocese "allowed the perpetuation of the belief that all Catholic institutions are connected to the Diocese." The students refer us to a recent Diocese website that lists Blue Cloud Abbey as a religious community in the Diocese.

"Agency is ostensible when by conduct or want of ordinary care the principal causes a third person to believe another, who is not actually appointed, to be his agent." SDCL 59-1-5. The students' reference to the Diocese's current website does not establish ostensible agency. That reference fails to identify the Diocesan conduct or omissions, at or before the time of the alleged abuse, that caused the students (or their parents or guardians) to believe that the other defendants were operating the school under an agency arrangement with the Diocese. Furthermore, ostensible agency is not established merely by having a "connection to the Diocese."

without going through the formalities necessary to legal adoption."); Restatement (Second) of Torts § 314A ("One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.")

[¶21.] Similarly, the students argue that the Diocese's relationship with the students created a fiduciary duty of protection. To establish a fiduciary duty, a plaintiff must show "that the defendant was acting as plaintiff's fiduciary." *Chem-Age Indus., Inc. v. Glover*, 2002 S.D. 122, ¶ 38, 652 N.W.2d 756, 772. This requires proof of "three things: (1) plaintiffs reposed 'faith, confidence and trust' in [the defendant], (2) plaintiffs were in a position of 'inequality, dependence, weakness, or lack of knowledge' and, (3) [defendant] exercised 'dominion, control or influence' over plaintiffs' affairs." *Id.* (quoting *Garrett v. BankWest Inc.*, 459 N.W.2d 833, 838 (S.D. 1990)).

[¶22.] The students did not identify facts sufficient to overcome summary judgment on their *in loco parentis* or fiduciary duty claims. Although there is no dispute that St. Paul's Indian Mission Corporation was acting in a custodial, parental role while the students were attending its school, the Diocese did not undertake a similar role. The students identified no facts indicating that the Diocese—as opposed to the priests, monks, nuns, entity defendants, and the school— was acting as the custodian or parent of the students while they attended school. Moreover, the students identified no facts indicating that, in placing the students at the school, the students (or the students' parents or guardians) reposed faith, confidence or trust in the Diocese—as opposed to the priests, monks, nuns,

entity defendants, and the school who were caring for the students. Therefore, the students failed to establish the existence of an *in loco parentis* or fiduciary relationship that imposed a Diocesan duty of protection while the students were in the custody and control of the entities that were operating this school.[11]

___

11. The students raise an additional argument in their reply brief. They argue that a fiduciary relationship existed between the Diocese and the students because the Diocese "acted as agents or representatives of God" and the students "were taught to put their trust and faith in the members of the Diocese, and were encouraged to do so by the Diocese." They also argue that the students "were children (weakness of age), removed from their native environments, entirely dependent on those who housed, clothed, fed and provided for their spiritual well-being." Thus, they argue that "the Diocese, its Bishop, and the religious and spiritual doctrine it espoused, had extraordinary influence and superiority of the children of the Diocese, which included the students and all children attending St. Paul's School." Based on these arguments, the students contend that "the Diocese had a supervisory duty to warn and protect the students from the acts of sexual abuse by the individual priests, monks and nuns, for the reason that such abuse was known or should have been known by the Diocese."

Neither party raised these arguments in their opening briefs. Although the students raised the arguments in their reply brief, the "reply brief must be confined to new matter raised in the brief of the appellee . . . ." SDCL 15-26A-62. We do not consider these arguments because they are first raised in the students' reply brief. *Cf. Agee v. Agee*, 1996 S.D. 85, ¶ 21 n.4, 551 N.W.2d 804, 807 n.4 ("A party may not raise an issue for the first time on appeal, especially in a reply brief when the other party does not have the opportunity to answer."). Moreover, the students' assertions appear to be mere argument based on language taken from other cases. The students have failed to provide citations to facts in this record from which we can determine whether these students, their parents, or their guardians put trust and faith in the Diocese (as opposed to the other defendants) before the alleged abuse. "This Court's appellate procedure regarding the appellant's brief requires that '[e]ach statement of a material fact shall be accompanied by a reference to the record where such fact appears.'" *Dakota Indus., Inc. v. Cabela's.com, Inc.*, 2009 S.D. 39, ¶ 18 n.4, 766 N.W.2d 510, 515 n.4 (alteration in original) (quoting SDCL 15-26A-60(5)). "[T]he ultimate responsibility for presenting an adequate record on appeal falls on the appellant." *Id.*

[¶23.]    In sum, there was no Diocesan respondeat superior liability.  Further, the students failed to establish a Diocesan duty based on negligence or breach of fiduciary duty during the time the students were in the custody and control of St. Paul's Indian Mission Corporation and the other defendants who were operating the school.  The circuit court's summary judgment on the students' claims against the Diocese is affirmed.

[¶24.]    GILBERTSON, Chief Justice, and KONENKAMP, SEVERSON, and WILBUR, Justices, concur.