#29460-r-PJD
**2021 S.D. 67**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

MARTY K. SYRSTAD,                          Plaintiff and Appellant,

    v.

MICHAEL J. SYRSTAD,                        Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BROOKINGS COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE DAWN M. ELSHERE
Judge

* * * *

ROBERT A. CHRISTENSON
Sioux Falls, South Dakota                  Attorney for plaintiff
                                       and appellant.


GARY W. SCHUMACHER of
Wilkinson & Schumacher Law, Prof LLC
De Smet, South Dakota                      Attorneys for defendant
                                       and appellee.

* * * *

CONSIDERED ON BRIEFS
APRIL 26, 2021
REASSIGNED
SEPTEMBER 9, 2021
OPINION FILED **12/15/21**

DEVANEY, Justice (on reassignment).

[¶1.] Marty Syrstad brought suit against her father-in-law, Michael Syrstad, alleging claims of alienation of affection and child sex abuse. This appeal concerns Marty's claim of child sex abuse, which the circuit court dismissed on summary judgment after concluding that Marty failed to timely bring suit under SDCL 26-10-25 within three years of the date she discovered or reasonably should have discovered her injury and its cause. Marty appeals, asserting that the circuit court erred in granting summary judgment. We reverse and remand.

## Factual and Procedural History

[¶2.] In 1993, when Marty was 14 years old, she began dating Michael's son, Jeremy Syrstad, and while the two were dating, she would spend a significant amount of time at the Syrstad home. Marty claimed that during this time, Michael "began to touch [her] body, kiss [her] on the lips, hug [her,] and hold [her] around her waist." She explained in her deposition that anytime she would go to the Syrstad home to see Jeremy, Michael would be physically affectionate with her. She also claimed that Michael "would comment about [her] appearance and development as a young woman going through puberty" and "would pull [her] over to him to sit on [his] lap or knee."

[¶3.] According to Marty, whenever Michael was near her, he would ask her to "give [him] some love," which to Marty meant a hug and kiss. She further asserted that if she stayed in close proximity to him, he would put his arm around her waist and draw her to his hips or groin; would "often" "brush, squeeze, cup or caress" Marty's breasts; and would "place his hand on [her] low back and slide it

down to brush, squeeze, cup or caress" her bottom. Marty also claimed that Michael would make comments to her, such as: "Oh my God, you are so beautiful"; "Wow, you are really getting some curves girl"; "Damn your [sic] hot, I want me some of that"; "Damn, my son is the luckiest man alive to get to hold you"; and "You can be his wife and still be my girlfriend." If family members or friends commented about Michael's behavior, he would say, "It's all good, she's my girl"; or "We keep i[t] all in the family."

[¶4.] Marty revealed more specifically the circumstances of two incidents with Michael that occurred while she was a minor. On one occasion at Michael's lake house where Michael, Jeremy, Marty, and others consumed alcohol, Michael helped Marty get into bed. She claimed that she was intoxicated at the time and that when Michael helped her, he unhooked her bra and removed it, and after laying her in bed, he unbuttoned and removed her pants and "patted" her bottom. Marty described another occasion that occurred while she was sitting closest to Michael in a pickup he was driving home from a street dance. Michael's wife and Jeremy were also in the pickup, and Marty claimed that as Michael was driving, he "held his right hand on the inside of [her] thigh and rubbed up until the back of [his] hand was against [her] vagina[.]"

[¶5.] In 1997, Marty turned 18, and on October 16, 1999, Marty married Jeremy. When Marty was 21 years old, she had sexual intercourse with Michael. She explained that she was working at a local bar as a bartender and Michael was at the bar drinking. After the bar closed, she left with Michael, and after the two drove around town talking, they had sexual intercourse. She agreed it was

consensual and testified that thereafter she and Michael had sexual intercourse approximately a dozen times until the spring of 2002 when Marty was approximately seven months pregnant with her second son.

[¶6.]       Although Marty did not continue her sexual relationship with Michael after 2002, she began to struggle with nightmares and overwhelming fears that Michael could be the father of her second son. Eventually, in the spring of 2005, Marty told Jeremy about the affair she had with Michael in 2001 and 2002. She also told him that she was concerned Michael was the father of their son. Although Jeremy "was furious" and "absolutely livid," the two decided to "work through whatever destruction" the affair caused. They also confirmed via DNA testing that Jeremy is the father of their son, not Michael.

[¶7.]       From 2005 to 2015, Marty and Jeremy attended marriage counseling and went to marriage retreats. Marty testified that they stopped all contact with Michael, and Jeremy decided to "cut" his entire side of his father's "family out of his life because he was desperately trying to save and salvage [their] marriage." In addition to working through the fact that Marty had an affair with Jeremy's father, the two also worked on issues related to Jeremy's alcoholism and the couple's loss of their relationship with the Syrstad family and friends. She explained that "[i]t was [their] intention to stay married[,]" and they fought hard "to save it." However, according to Marty, she and Jeremy "could not seek appropriate help" to save the marriage because "there was a huge white elephant in the middle of [their] relationship" that "at the time" they "could not identify, could not acknowledge[.]"

Ultimately, in 2015, the couple separated, and in March 2015, Jeremy filed for and obtained a divorce.

[¶8.] After the divorce, Marty continued individual counseling one hour every week or every other week, but she did not believe she was getting the care or counseling she needed. She sought treatment at an inpatient facility that specializes in mental and emotional care, and in the summer of 2017, Marty checked herself into The Meadows, a trauma treatment facility in Wickenburg, Arizona. Marty claimed that while at The Meadows, she began "the journey to understand" she had been sexually abused as a child by Michael and that this earlier abuse may have been the cause of her later behaviors and resulting marital and mental health issues. Then, according to Marty, in 2018, she "actually realized the impact (depression, anxiety, loss of relationship) on her life [from] Michael's inappropriate acts toward her" after "she heard a sexual abuse victim share his story[.]"

[¶9.] In February 2019, Marty brought suit against Michael alleging a claim for alienation of affection and later amended her complaint to add a claim for child sex abuse under SDCL 26-10-25. Michael filed a motion to dismiss both claims, alleging that neither was timely commenced. The circuit court determined that Marty's alienation of affection claim accrued in 2015 based on Marty's allegation in her complaint that she and Jeremy had "lived together and were happy from the time of their marriage until . . . 2015." The court thereafter dismissed this claim because Marty failed to bring suit within three years as required under SDCL 15-2-

14(3).[1] The court did not dismiss the child sex abuse claim, commenced in 2019, because it determined, based on the facts alleged in Marty's complaint, that she was not on inquiry notice of her claim until she obtained treatment in 2017.

[¶10.]     After conducting discovery, including taking Marty's deposition, Michael filed a motion for summary judgment, again asserting that Marty failed to timely commence her suit alleging child sex abuse. Relying on her deposition testimony, Michael noted that Marty was aware of his alleged acts that occurred when she was a child and was further aware in 2005 that her relationship with him caused problems between her and Jeremy. Therefore, he claimed that the undisputed material facts showed that she was on inquiry notice in 2005, when she told Jeremy about her affair with Michael, to seek out information regarding her injury and its cause. In response, Marty asserted that despite her knowledge of her affair with Michael, "there [was] nothing [she] could have inquired into" regarding the child sex abuse "because she was unaware that [Michael] was the cause of her condition[.]" In her view, the record established that "[t]he objective fact that triggered the statute of limitations surfaced" during her treatment at The Meadows in 2017 when she began her journey of understanding how Michael's earlier acts toward her were abusive and how they affected her.

---

1.     SDCL 15-2-14 provides:

> Except where, in special cases, a different limitation is prescribed by statute, the following civil actions other than for the recovery of real property can be commenced only within three years after the cause of action shall have accrued:
> . . .
> (3) An action for personal injury.

[¶11.]     The circuit court issued a memorandum decision after a hearing on Michael's motion.  Relying on *Rodriguez v. Miles*, 2011 S.D. 29, 799 N.W.2d 722, the circuit court determined that Marty was on inquiry notice of her claim "as early as 2002 but as late as 2005 when she disclosed the affair to her husband and began the long road of attempting to salvage her marriage" because these facts would "cause a reasonably prudent person to seek out information regarding her injuries and its cause."  Because Marty filed her amended complaint more than three years after 2005, the circuit court granted Michael's motion for summary judgment and dismissed Marty's child sex abuse claim as untimely under SDCL 26-10-25.

[¶12.]     Marty appeals, alleging the circuit court erred in granting summary judgment.

## Standard of Review

[¶13.]     When summary judgment is granted on a statute of limitations defense, the same well-settled rules governing summary judgment review apply. *Strassburg v. Citizens State Bank*, 1998 S.D. 72, ¶ 5, 581 N.W.2d 510, 513.  "We review de novo a circuit court's entry of summary judgment."  *Tammen v. Tronvold*, 2021 S.D. 56, ¶ 17, 965 N.W.2d 161, 168.  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  SDCL 15-6-56(c).  We view the evidence and all reasonable inferences in a light most favorable to the nonmoving party and resolve reasonable doubts against the moving party.  *Strassburg*, 1998 S.D. 72, ¶ 5, 581 N.W.2d at 513.  Our task on appeal is to

"determine whether the moving party has demonstrated the absence of any genuine issue of material fact and entitlement to judgment on the merits as a matter of law." *Bernie v. Cath. Diocese of Sioux Falls*, 2012 S.D. 63, ¶ 7, 821 N.W.2d 232, 237 (citation omitted).

## Analysis and Decision

[¶14.] Marty contends that while she "knew a problem existed in her marriage because of [her] sexual association with Michael as an adult," the circuit court erred in concluding that the undisputed facts showed she was on inquiry notice of the child sex abuse and its connection to her injury more than three years prior to her bringing suit against Michael. She claims that the record contains no evidence that she was aware of the child sex abuse or its impact on her life until her treatment at The Meadows in 2017. Marty asserts that it was not until she was engaged in this treatment that she came to understand that she had been the victim of sexual abuse as a child and that it was the cause of her later trauma, emotional pain, and mental health issues.

[¶15.] In response, Michael and the dissent focus on the fact that Marty was aware of Michael's acts toward her when she was a child and knew in 2005 that her relationship with him caused marital problems between her and Jeremy. Both the dissent and Michael contend that these undisputed facts put Marty on inquiry notice to seek out information about her injury and its cause, and therefore, the circuit court properly granted summary judgment dismissing Marty's claim of child sex abuse under SDCL 26-10-25.

[¶16.]     "While we often distinguish between the moving and non-moving party in referring to the parties' summary judgment burdens," the focus of the inquiry is different when a motion for summary judgment is based on the affirmative defense that a cause of action is time-barred. *Zephier v. Cath. Diocese of Sioux Falls*, 2008 S.D. 56, ¶ 6, 752 N.W.2d 658, 662. As this Court explained in *Zephier*,

> SDCL 26-10-25 is an affirmative defense, and the burden of proof to establish affirmative defenses is on the party who seeks to rely on it. *Clancy v. Callan*, 90 S.D. 115, 118, 238 N.W.2d 295, 297 (1976) (citing *Lang v. Burns*, 77 S.D. 626, 97 N.W.2d 863, 865 (1959)). The burden of production, however, shifts. "In summary judgment proceedings, where the defendant asserts the statute of limitations as a bar to the action, and presumptively establishes the defense by showing the case was instituted beyond the statutory period, the burden then shifts to the plaintiff to establish the existence of material facts in avoidance of the statute of limitations[.]" *Conway v. Conway*, 487 N.W.2d 21, 23 (S.D. 1992).

*Id.* ¶ 9, 752 N.W.2d at 663–64; *accord One Star v. Sisters of St. Francis*, 2008 S.D. 55, ¶ 12, 752 N.W.2d 668, 675. "Generally, a statute of limitations question is left for the jury; however, '[d]eciding what constitutes accrual of a cause of action' is a question of law and reviewed de novo. In reviewing under this standard, '[w]e give no deference to the trial court's conclusions of law.'" *One Star*, 2008 S.D. 55, ¶ 12, 752 N.W.2d at 675 (quoting *Peterson v. Hohm*, 2000 S.D. 27, ¶ 8, 607 N.W.2d 8, 11).

[¶17.]     Because the circuit court granted Michael summary judgment on the affirmative defense that Marty failed to timely commence suit under SDCL 26-10-25, we must first examine whether the court properly determined that Michael presumptively established that Marty brought her claim beyond the statutory period. Under SDCL 26-10-25:

> Any civil action based on intentional conduct brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse shall be commenced within three years of the act alleged to have caused the injury or condition, *or three years of the time the victim discovered or reasonably should have discovered that the injury or condition was caused by the act, whichever period expires later.* However, no person who has reached the age of forty years may recover damages from any person or entity other than the person who perpetrated the actual act of sexual abuse.

(Emphasis added.) In determining when a claimant "discovered or reasonably should have discovered" the causation of an alleged injury or condition, *see id.*, the question is whether the plaintiff became aware of facts that would have prompted "a reasonably prudent person to seek out information regarding his or her injury or condition and its cause[,]" *see Rodriguez*, 2011 S.D. 29, ¶ 9, 799 N.W.2d at 725 (citation omitted). As the Court in *Zephier* explained, "one having actual notice of circumstances sufficient to put a prudent person on inquiry about a particular fact, and who omits to make such inquiry with reasonable diligence, is deemed to have constructive notice of the fact itself sufficient to start the running of the statute of limitations." 2008 S.D. 56, ¶ 14, 752 N.W.2d at 665. "Inquiry notice is determined by an objective standard." *Rodriguez*, 2011 S.D. 29, ¶ 11, 799 N.W.2d at 727.

[¶18.] In this case, the circuit court, Michael, and the dissent fail to appreciate the significance of the unique fact that the conduct forming the basis of Marty's lawsuit against Michael (inappropriate sexual touching of a child by a trusted individual) evolved into consensual adult sexual conduct between a father-in-law and daughter-in-law. As Marty explained in her statement of disputed facts, while she "was haunted by the incident of having sex with the father of her husband when she was an adult," "how [Michael] groomed [her] while [she] was a minor is an

entirely separate matter, a matter she never correlated to the cause of her problems as an adult" until she entered treatment. The dissent nevertheless concludes that Marty was on inquiry notice that Michael's behavior toward her when she was a child was the cause of her later injuries because she underwent "ten years of marital counseling with Jeremy[.]" (Emphasis omitted.) But the record does not support the assumptions upon which the dissent's conclusion rests because there is no evidence in the record that, during the years of marital counseling, the alleged child sex abuse was discussed.

[¶19.] In light of the distinct difference between child sex abuse and an adult consensual sexual relationship, the undisputed evidence that Marty told Jeremy in 2005 about her *adult* affair with Michael, a disturbing situation in and of itself, and that the two thereafter went to marriage counseling for several years does not presumptively show that Marty was aware she was the victim of child sex abuse or that she reasonably should have discovered that her injury or condition was caused by the abuse more than three years before she commenced suit. As we have held in our prior cases involving child sex abuse, SDCL 26-10-25 gives "victims time to discover the causal relationship between the sexual abuse and the resulting injury." *Bernie v. Blue Cloud Abbey*, 2012 S.D. 64, ¶ 3, 821 N.W.2d 224, 226. Therefore, the discovery of "the injuries in and of itself will not suffice to commence the statutory period regarding discovery of the causal connection between the acts of abuse and the plaintiffs' injuries. 'Rather, there must be discovery of some tie linking the acts of abuse to the injury.'" *Zephier,* 2008 S.D. 56, ¶ 10, 752 N.W.2d at 664 (citation omitted) (concluding that defendants failed to make a presumptive showing because

defendants did not introduce evidence showing that plaintiffs should have reasonably discovered that their injury or condition was caused by child sex abuse more than three years before commencing suit). As this Court has explained,

> Imagine being pricked on the arm with a pin. At first, such an intrusion would be disturbing, but with time might seem uneventful. Now imagine the pin carried a dreaded affliction, only discoverable after years of incubation. Such is often the nature of childhood sexual abuse. *Many children only realize years later the true significance of the abuse they endured, especially in cases where the molestation occurred at the hands of family members or other trusted individuals.* For some children, sexual violation is so traumatic it becomes psychologically self-concealing, if only to preserve sanity. For this reason, our Legislature enacted SDCL 26-10-25 creating a discovery rule for adult survivors of child sex abuse.

*Stratmeyer v. Stratmeyer*, 1997 S.D. 97, ¶ 13, 567 N.W.2d 220, 222–23 (emphasis added).

[¶20.] Here, a review of the record does not show any evidence that Marty was aware, prior to attending in-patient treatment in June 2017, that she had been the victim of child sex abuse and that there was a causal connection between Michael's earlier conduct of sexually grooming her when she was a child and the injuries that manifested much later in life. Rather, Marty's deposition testimony and the affidavit of her therapist evince just the opposite. Marty testified that despite ten years of marriage counseling, she and Jeremy were never able to identify the true issue that would have allowed them to obtain appropriate help to keep their marriage together.[2] She further testified that it was not until she sought

---

2. The dissent's reliance on Marty's use of the phrase "huge white elephant" is misplaced. She did not use that phrase to indicate her understanding of the nature and impact of Michael's behavior and acts toward her from its

(continued . . .)

treatment in 2017 for her anxiety and depression that she understood she had been sexually abused as a child by Michael and that this earlier abuse may have been the cause of her later behaviors and resulting marital and mental health issues. Her therapist, in his affidavit, stated that in his opinion, the abuse Marty suffered at the hands of Michael "became psychologically self-concealing" and that Marty "only realized years later the true significance of the sexual abuse and damages resulting from the abuse," with the "initial realization occurring at The Meadows on June 6, 2017." In a subsequent affidavit, he attested that although Marty "acknowledged to her husband that she had sex with his father she did not acknowledge it was abuse nor did she connect it with the childhood abuse that had already occurred."

[¶21.] Michael offered no evidence disputing this evidence. However, Michael claims that Marty was on inquiry notice of her claim under SDCL 26-10-25 because she testified that Michael's acts of child sex abuse toward her "have 'never' been out of her mind[.]" The dissent suggests the same conclusion based on the same testimony. However, the dissent and Michael mischaracterize Marty's deposition testimony. Marty did not testify that she "never" stopped thinking about the *child sex abuse* from the time that it happened. Rather, she explained, in response to Michael's counsel asking her to put her *damages* into context, that her treatment counselors at The Meadows (starting in 2017) had asked her "to go back to day one,

_____

(. . . continued)
inception. Rather, when Marty referred to a "huge white elephant in the middle of [their] relationship" that neither she nor Jeremy could identify, she was responding to a line of questioning focusing on how her consensual affair with her father-in-law led to a series of events that impacted Jeremy's relationship with his family, his job, and their marriage.

as far back as [she could] remember." In doing so, she thought about her past and about everything that had happened to her. She explained that after this process of evaluating her life, her relationship with Michael is something that "never goes out of [her] mind" and her "life is forever changed because of the inappropriate relationship with Mike Syrstad." When Marty's deposition testimony is viewed in this context—that her reflection and realization occurred during her treatment at The Meadows—it does not support Michael's argument that Marty was aware since 2005 of facts that would prompt "a reasonably prudent person to seek information about the problem and its cause." *See Zephier*, 2008 S.D. 56, ¶ 14, 752 N.W.2d at 665 (citation omitted).

[¶22.] A review of this Court's past cases, in which we determined that a plaintiff was on inquiry notice of the child sex abuse cause of action, reveals distinct differences from the circumstances here. Our past cases involved plaintiffs who either openly acknowledged that they had been abused as children and had experienced adverse effects as a result of the abuse, or plaintiffs who had either sought counseling because of the abuse or were advised by counselors that their problems stemmed from childhood abuse. On appeal, this Court was able to identify in each case specific evidence showing that it was undisputed that the plaintiffs knew of the child sex abuse (the problem) *and* were aware of its causal connection to their subsequent behavioral and mental health problems long before they decided to commence litigation against the perpetrators.

[¶23.] For example, in *One Star*, two plaintiffs brought suit against various defendants in 2005 for acts of abuse that occurred more than 40 years prior at the

hands of priests, brothers, and sisters of a religiously run boarding school. 2008 S.D. 55, ¶ 2, 752 N.W.2d at 672. One defendant, the Sisters of St. Francis, Denver Colorado (Sisters), filed a motion for summary judgment against both plaintiffs' claims asserting that neither timely commenced suit. *Id.* ¶ 8, 752 N.W.2d at 673. The circuit court denied summary judgment; however, on appeal, we reversed.

[¶24.]    We determined that "Sisters [had] presumptively established that One Star was on inquiry notice of the relationship between his condition and its cause when he responded [by letter] to [a] newspaper advertisement in May of 2001" soliciting information on abuse suffered by former students of the boarding school. *Id.* ¶ 19, 752 N.W.2d at 677. One Star stated in his letter that he knew what was done to him at the boarding school and that it affected him "in a bad way [his] whole life . . . ." *Id.* In regard to the other plaintiff, Sorace, the Court determined that "Sisters [had] also presumptively established that Sorace commenced her case more than three years after she was on actual or inquiry notice that her injuries were caused by the abuse" because during counseling in 1995, Sorace's mental health counselor advised her that "her anger issues were connected to the sexual abuse" and encouraged her to seek professional help to treat her injuries. *Id.* ¶ 21, 752 N.W.2d at 677–78. We determined that at that point, "Sorace possessed actual knowledge of a causal connection to her anger management problem" and was "on inquiry notice to seek information about the problem and its cause." *Id.* ¶ 21, 752 N.W.2d at 678. *See also Rodriguez,* 2011 S.D. 29, ¶¶ 10, 11, 799 N.W.2d at 726–27 (undisputed that plaintiff knew of the sexual abuse and its effects more than three years prior to commencing suit); *Iron Wing v. Cath. Diocese of Sioux Falls,* 2011

S.D. 79, ¶ 5, 807 N.W.2d 108, 110 (plaintiff testified that he was aware of the anger and hatred the sexual abuse had caused since his junior year of high school).

[¶25.] In contrast, here, the record does not contain undisputed evidence that Marty should have been on inquiry notice, prior to 2017, that Michael's behavior toward her when she was a child was sexually abusive, or that this behavior was the cause of her later problems. Genuine issues of material fact exist regarding whether Marty could have reasonably believed until 2017 that the consensual adult extramarital affair with Michael and the concern that he might be the father of one of her children were the events that precipitated the breakdown of Marty's marriage and caused her emotional injuries, rather than the alleged sex abuse that occurred when she was a child. When viewing the record in a light most favorable to Marty, Michael has not presumptively established that Marty instituted her child sex abuse action beyond the limitation period in SDCL 26-10-25.[3] Therefore, the circuit court erred in granting summary judgment dismissing Marty's claim as untimely.

[¶26.] Reversed and remanded.

[¶27.] JENSEN, Chief Justice, and SALTER, Justice, concur.

[¶28.] KERN and MYREN, Justices, dissent.

---

3. Because Michael did not make the necessary showing on summary judgment, we need not examine the second inquiry—whether Marty met her responsive burden of identifying material facts in avoidance of the statute of limitations. *See Zephier*, 2008 S.D. 56, ¶ 11, 752 N.W.2d at 664 (because the defendants did not "make their initial presumptive showing[,]" the plaintiffs' "responsive showing was immaterial at this stage of the summary judgment proceeding").

KERN, Justice (dissenting).

[¶29.] Marty argues that her cause of action was timely filed because it first accrued when she was put on inquiry notice of past child sexual abuse in 2017, after she had checked herself into The Meadows, an inpatient treatment facility, and became aware of the effects of the child abuse she endured in her life. Because in my view, there is no genuine issue of fact as to Marty having been on inquiry notice, at the latest, by the time of her divorce in 2015, putting her claim outside the statute of limitations, I respectfully dissent.

[¶30.] SDCL 26-10-25 provided Marty with an extended time period in which she could bring her civil action, specifically, within "three years of the time [Marty] *discovered or reasonably should have discovered* that [her] injury or condition was caused by the act[.]" (Emphasis added.) This extension is intended to give "victims time to discover the causal relationship between the sexual abuse and the resulting injury." *Bernie*, 2012 S.D. 64, ¶ 3, 821 N.W.2d at 226.

[¶31.] However, "[l]imitations periods will not abide indefinitely while those aggrieved discover all their damages." *One Star*, 2008 S.D. 55, ¶ 16, 752 N.W.2d at 676 (citation omitted). Once those aggrieved are aware of the injury, they have a duty to investigate its cause "by the use of the means of information within [their] reach, with the vigilance which the law requires of [them,]" even if they "may not have exact knowledge of the nature of the problem that caused the injury." *Id.* ¶ 25, 752 N.W.2d at 679 (quoting *Woodroffe v. Hasenclever*, 540 N.W.2d 45, 49 (Iowa 1995)). Therefore, the cause of action "accrues when the plaintiff is put on inquiry notice of facts that would prompt *a reasonably prudent person* to seek out

information regarding his or her injury or condition and its cause." *Rodriguez*, 2011 S.D. 29, ¶ 9, 799 N.W.2d at 725 (emphasis added) (citation omitted).

[¶32.]     The issue of inquiry notice is determined against an objective standard. *Rodriguez*, 2011 S.D. 29, ¶ 11, 799 N.W.2d at 727. Using an objective standard means that, regardless of what Marty *subjectively* investigated and understood, we must evaluate *objectively* what a "reasonably prudent person" would have investigated and understood. *See id.* To make such an objective determination, we should consider whether Marty had "information sufficient to alert a reasonable person of the need to investigate the injury . . . ." *Redwing v. Cath. Bishop for Diocese of Memphis*, 363 S.W.3d 436, 459 (Tenn. 2012) (cleaned up). Therefore, when sufficient information to put a reasonably prudent person on notice is present, the specific individual at issue, regardless of his or her subjective awareness, is on inquiry notice and the statute of limitations begins to run.

[¶33.]     Here, Marty has never alleged that she was unaware of Michael's behavior toward her or that she suppressed the memory of his acts. On the contrary, the record reflects that Marty informed Jeremy about her sexual relationship with Michael in 2005, and she testified that she was "haunted" by "these issues" since 2005 and tried to move on with her life by engaging in marriage counseling in an attempt to save her marriage.[4] Thus, Marty had actual knowledge

---

4.  The majority opinion states that "there is no evidence in the record that, during the years of marital counseling, the alleged child sex abuse was discussed." Indeed, the record before us does not contain the therapy notes, if any exist, from these years of marital counseling. Therefore, we must make our determination upon Marty's testimony regarding the counseling,

(continued . . .)

of Michael's behavior toward her and his acts against her when she was a child.
Because this actual knowledge is present, our inquiry should proceed to whether the
knowledge Marty had prior to participating in treatment at The Meadows in 2017
was sufficient to put a reasonably prudent person on notice that Michael's behavior
was the cause of Marty's injury.

[¶34.] The majority opinion determines that Michael did not presumptively
establish a statute of limitations defense because Marty did not discover "some tie
linking the acts of abuse to the injury" until she attended therapy at The Meadows
in 2017. However, the record shows an abundance of facts that would put a
reasonably prudent person on notice when viewed objectively. By 2002, Marty had
engaged in and ended a consensual sexual relationship with Michael while she was
married to his son. By 2005, Marty had told Jeremy about the affair and had gone
through the process to determine that Jeremy was the father of her second child,
which included DNA testing of her child, Jeremy, and Michael. There is no factual
dispute that, in 2005 at the latest, Marty was aware that her sexual relationship
with Michael caused a disruption in her life and marriage so significant that she
and Jeremy began and then continued marriage counseling for ten years. Applying
the objective standard that the law requires to Marty's situation, it would be
apparent to a reasonably prudent person that Michael's involvement with Marty
from 1993 until 2002 caused significant difficulties in her life. These circumstances
gave Marty actual notice sufficient to alert a prudent person about her injury and

---

(. . . continued)
 specifically, that Marty and Jeremy were fighting to save their marriage after
 Marty disclosed her relationship with Michael to Jeremy.

its cause—her relationship with Michael in its entirety, including when she was a child—by 2005, rendering her suit untimely.

[¶35.] At the latest, Marty was on inquiry notice of her injury and its cause by 2015, four years before her complaint was filed, still placing her suit outside of the statute of limitations period. In 2015, Marty and Jeremy were divorced. By 2015, Marty had undergone *ten years* of marital counseling with Jeremy, prompted by the facts discussed in the paragraph above, all during which time Marty remembered and was aware of Michael's behavior and acts toward her as a child. Marty testified:

> We went to marriage counseling. We went to marriage retreats. We went to Catholic Retrouvaille retreats. We sought counsel with marriage therapists. We sought counsel with [Jeremy's] grandmother, Michael's mom, Laquita because she was a counselor as well . . . . It was our intention to stay married and we were fighting like hell to save it . . . .

During this time, Marty had a reasonable basis to diligently investigate her entire relationship with Michael from beginning to end as the potential cause of her injury. This counseling, which brought her relationship with Michael to the forefront of her and Jeremy's marital difficulties, would have alerted a reasonably prudent person to the connection between Michael's sexual abuse and her injury. Considered together, these are sufficient circumstances of which Marty had actual knowledge that would prompt a reasonably prudent person to seek out information regarding her injury and its cause. Therefore, Michael presumptively established that Marty was on inquiry notice, at the latest, by 2015, which would render Marty's suit untimely.

[¶36.]	Here, Marty's alleged subjective inability to connect the full extent of her injuries to the sexual abuse is not the controlling factor. Marty was on inquiry notice of the causal connection between Michael's acts of abuse and her injuries, and our inquiry in this case must view the circumstances from that of a reasonably prudent person, not from Marty's subjective prospective. Marty testified that she attempted to put the memory of her contacts with Michael from their inception out of her mind. She described Michael's behavior and acts as the "huge white elephant" in the room that she could not identify or acknowledge in counseling *despite* the 2005 DNA disclosure and her admissions to Jeremy. Because the law includes a clear period of statutory limitation, despite the disturbing nature of this child sexual abuse claim, we cannot abide an indefinite delay for those aggrieved to fully discover the extent of their injuries without rendering the statute meaningless.

[¶37.]	Accordingly, the undisputed material facts reflect that Marty was on inquiry notice of the causal connection between the acts of abuse and her injuries at the latest in 2015, when Marty and Jeremy divorced, and potentially as early as 2005, when Marty and Jeremy first entered marital counseling following Marty's disclosure to him of her relationship with Michael. Because the statute of limitations period had passed even if Marty first had inquiry notice at the time of her divorce in 2015, her cause of action for child sexual abuse falls outside the statute of limitations.

[¶38.]	MYREN, Justice, joins this dissent.