2005 SD 41

Dale McMILLIN, as Personal Representative of the Estate Of Roger McMillin, and Roland Heinert and Darlene Heinert, as the Special Administrator of the Estate of Duane Heinert, Plaintiffs and Appellants,

v.

Frank MUELLER, Individually and as an Agent of Mueller Feed Mill, Inc.; Fred Mueller Individually and as an Agent of Mueller Feed Mill, Inc., and Mueller Feed Mill, Inc., Defendants and Appellees.

No. 23215.

Supreme Court of South Dakota.

Considered on Briefs Nov. 15, 2004.

Decided March 23, 2005.

Rena M. Atchison of Abourezk & Zephier, Rapid City, South Dakota, Attorneys for plaintiff and appellant Estate of Roger McMillin.

Stephanie E. Pochop of Johnson Eklund Law Office, Gregory, South Dakota, Attorneys for plaintiff and appellant Estate of Duane Heinert.

Thomas H. Barnes of Costello, Porter, Hill, Heisterkamp, Bushnell & Carpenter, Rapid City, SD, Attorneys for defendants and appellees Frank and Fred Mueller individually.

Charles M. Thompson of May, Adam, Gerdes & Thompson, Pierre, South Dakota, Attorneys for defendant and appellee Mueller Feed Mill, Inc.

ENG, Circuit Judge.

[¶ 1.] Roger McMillin and Duane Heinert were employees at Mueller Feed Mill, Inc., located outside of Martin, South Dakota. On September 10, 2002, Roger and Duane died while cleaning an underground storage tank containing molasses used to

mix and flavor livestock feed. Dale McMillin, as personal representative of the estate of Roger McMillin, and Rolan Heinert, as special administrator of the estate of Duane Heinert (collectively estates) brought a tort claim against Frank and Fred Mueller individually and Mueller Feed Mill, Inc. (Mill). Defendants moved for summary judgment pursuant to SDCL 15-6-56(b) claiming that the South Dakota Workers' Compensation Act was the exclusive remedy for the estates. The trial court, the Honorable Kathleen F. Trandahl, granted summary judgment to the defendants. The estates appeal arguing that the trial court committed error when it granted summary judgment to defendants. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] Mill has operated near Martin, South Dakota for over forty years. As part of Mill's business, it produces livestock feed by processing grains into pellets and mixing those pellets with molasses. This makes the pellets stick together and gives them flavor. The Mueller family has operated the Mill since its inception and the current president is Frank Mueller. Fred Mueller (Frank's father) is considered an owner of the Mill although his exact title is unclear.

[¶ 3.] The molasses used to flavor the pellets is stored in a large underground tank resembling a propane tank. The tank itself is approximately eight feet in diameter and twenty to twenty-five feet in length. There is a four-inch outlet pipe and a pump at one end that distributes the molasses to a conditional chamber to be mixed with the pellets. There is only one access point into the tank, through a hole at the top covered by two lids.[1] To gain entry into the tank, a person is lowered by standing on a log chain attached to a forklift located directly above the hole. Another employee must lower the chain and the person into the tank. The tank requires yearly cleaning due to the tendency of the molasses to dry and become chunky, clogging the pump and the outlet pipe. The only method of cleaning is by lowering a person into the tank who then manually removes the chunks from the outlet pipe and the walls. In the forty years the Mill has mixed molasses with feed pellets, many employees, including Fred and Frank Mueller and Frank's son Ryan, have entered the molasses tank to perform its yearly cleaning.

[¶ 4.] On September 10, 2002, Frank Mueller made the decision to clean the molasses tank. That morning, after removing the tank's lids and leaning his head about a foot into the tank, Frank inspected it with a flashlight and determined someone needed to go into the tank and remove the chunks from the walls and the outlet. Frank then met with his employees, Roger McMillin, Duane Heinert, Harlan Richards and David McMillin to discuss their daily assignments. Roger and Duane were assigned to replace the bearings in a leg on top of the Mill that was located outside of the building housing the molasses tank while David, Harlan and Frank went to the mill room to clean the molasses tank.

[¶ 5.] Around 8:30 a.m., David lowered Harlan into the tank while Frank watched from the side. Just as Harlan's head was about three or four inches from the top of the hole, Harlan told Frank and David that he could not breathe and to take him out of the hole.[2] After Harlan was taken out

---

1. The outer lid is a heavy man hole type cover while the inner lid is a lighter version of the outer cover.

2. Harlan later testified upon deposition that his breathing difficulty was "more like a panic thing" due to being claustrophobic.

of the tank, Frank went to Duane and Roger and asked them to clean the tank when they were finished replacing the bearings. Since both Duane and Roger had been in the tank before, Duane said he would finish the job. By the time Duane and Roger entered the mill room, Harlan and David were working in another area of the Mill and did not get a chance to discuss Harlan's breathing difficulties while in the tank.

[¶ 6.] As Roger lowered Duane into the molasses tank, Frank went back to his office. By the time Roger got off of the forklift and looked down into the tank, Duane was face down in the bottom of the tank. Roger then yelled to Harlan and David for help and Harlan went to Frank's office to tell him something was wrong in the mill room. When Frank entered the mill room, Roger was standing above the tank's opening and was trying to get Duane to answer. Frank looked in the tank and saw Duane laying crossways in the molasses. Roger told Frank that he thought Duane had suffered a heart attack. Frank immediately left the mill room to obtain a safety harness to remove Duane from the tank. While Frank was out of the mill room, David moved into the driver's seat of the forklift and lowered Roger into the tank. After Roger was completely in the tank, Frank returned to the mill room to find Roger trying to turn Duane over. At that moment, Roger fell on top of Duane. Frank rushed to his office and called 911. Frank then waited in the mill room until the emergency personnel arrived.

[¶ 7.] When emergency services arrived, Duane and Roger were removed from the tank. Both were pronounced dead at the scene and the cause of death was later described as "asphyxiation/aspiration" and/or "suffocation secondary to exposure to an environment high in hydrogen sulfide and low in oxygen." The Hazardous Material Team from the Rapid City Fire Department concluded that oxygen levels in the tank were around 5.7 percent, the carbon monoxide level reached 62 ppm, the LEL alarm sounded and hydrogen sulfide rapidly climbed and saturated the sensor. In other words, the lack of oxygen and high level of hydrogen sulfide made it impossible to breathe in the tank. When asked how this gas was produced, the Hazardous Material Team suggested the molasses fermented in the hot, dry summer which was above the average for heat and dryness.

[¶ 8.] Dale McMillin, as personal representative for the estate of Roger McMillin, and Rolan Heinert, as special administrator for the estate of Duane Heinert, brought an intentional tort claim arising out of the workplace deaths of Roger and Duane against Frank and Fred Mueller individually and the Mill. The defendants moved for summary judgment as a matter of law claiming that SDCL 62–3–2 limited the plaintiffs' exclusive remedy as a recovery under the South Dakota Workers' Compensation Act. The plaintiffs disagreed and argued that a 1999 Safety Plan, implemented by the Mill and submitted to the Occupational Safety and Health Administration (OSHA), removed the recovery from the exclusivity of the workers' compensation laws and into the realm of intentional tort law.[3] The estates alleged that

3. In 1999 a work related accident occurred at the Mill which led to the death of another employee. The 1999 accident was a fatal fall that occurred in a different area of the Mill. After the fall, defendants submitted a safety plan to OSHA which included a section on page 8 that generally stated confined spaces such as tanks can create a suffocation or asphyxiation hazard. The safety plan also contained a section labeled "Confined Space Entry" which generally declared that injury or death attributed to careless procedures and

since the safety plan was in effect, the Muellers knew of the probable harm of entering the tank without a breathing apparatus and deliberately put their employees at risk. The trial court granted summary judgment to the defendants. The estates appeal.

## STANDARD OF REVIEW

[¶ 9.] Our standard of review for the grant or denial of a motion for summary judgment is well settled.

> Summary judgment is authorized if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. SDCL 15–6–56(c). We will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided. *Bego v. Gordon*, 407 N.W.2d 801, 804 (S.D.1987). All reasonable inferences drawn from the facts must be viewed in favor of the non-moving party. *Morgan v. Baldwin*, 450 N.W.2d 783, 785 (S.D.1990). The burden is on the moving party to clearly show an absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Wilson v. Great N. Ry. Co.*, 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968).

*Holzer v. Dakota Speedway, Inc.*, 2000 SD 65, ¶ 8, 610 N.W.2d 787, 791. "Summary judgment is 'usually not appropriate in negligence actions because the standard of a reasonable person must be applied to conflicting testimony. If, however, the facts are undisputed, the issue becomes one of law for this Court to decide.'" *Taggart v. Ford Motor Credit Co.*, 462 N.W.2d 493 (S.D.1990) (quoting *Gasper v. Freidel*, 450 N.W.2d 226 (S.D.1990)). "Thus, summary judgment is appropriate to dispose of legal, not factual questions." *Ramesbotham v. Farmers Elevator Co.*, 428 N.W.2d 542, 543 (S.D.1988) (citing *Hamaker v. Kenwel–Jackson Machine, Inc.*, 387 N.W.2d 515 (S.D.1986)).

## ANALYSIS AND DECISION

### ISSUE

[¶ 10.] **Whether the trial court committed reversible error when it granted summary judgment in favor of defendants pursuant to SDCL 62–3–2.**

[¶ 11.] SDCL 62–3–2 was the basis for the trial court's grant of summary judgment in favor of the defendants. That statute provides:

> The rights and remedies herein granted to an employee subject to this title, on account of personal injury or death arising out of and in the course of employment, shall exclude all other rights and remedies of such employee, his personal representatives, dependents, or next of kin, on account of such injury or death against his employer or any employee, partner, officer or director of such employer, except rights and remedies arising from *intentional tort.*

SDCL 62–3–2. (emphasis added).

[¶ 12.] The necessity of this statute has recently been discussed by this Court where it was recognized that:

> In the workers' compensation scheme, exclusivity serves two important values: (1) it maintains the balance of sacrifices between employer and employee in the substitution of no-fault liability for tort liability, and (2) it minimizes litigation, even litigation of undoubted merit. Exclusiveness imparts efficiency to the

a failure to take the proper precautions could result in areas such as liquid tanks.

workers' compensation system. Every presumption is on the side of avoiding superimposing the complexities and uncertainties of tort litigation on the compensation process.

*Fryer v. Kranz*, 2000 SD 125, ¶ 9, 616 N.W.2d 102, 105. (internal citations omitted). As a result, workers' compensation is meant to be the exclusive remedy for all injuries that occur on the job except for those intentionally inflicted by the employer. Only if the employee can show that an ordinary, reasonable, prudent person would believe an injury was substantially certain to result from the employer's conduct can that worker bring suit against the employer at common law.

■■ [¶ 13.] This is because the legislature intended workers' compensation to be the exclusive remedy for employees injured on the job "in all but extraordinary circumstances." *Harn v. Continental Lumber Co.*, 506 N.W.2d 91, 95 (S.D.1993) (citing *Jensen v. Sport Bowl, Inc.*, 469 N.W.2d 370, 371 (S.D.1991)). An "extraordinary circumstance" is defined as a situation where the employer *"intends* to cause the injury suffered by the worker." *Jensen*, 469 N.W.2d at 371. Additionally, it has been recognized that the vast majority of the courts in the country that have interpreted this type of statute determined that "intent pointedly means intent." *Harn*, 506 N.W.2d at 95. This narrow construction of the intentional tort exception to workers' compensation exclusivity has been, and still is, the majority rule of the courts in this country and is the law of this state. *Id.* (citing *Brazones v. Prothe*, 489 N.W.2d 900, 906 (S.D.1992); *Jensen*, 469 N.W.2d at 372). "Even when employers act or fail to act with a conscious realization that injury is a probable result, workers' compensation is still the exclusive remedy for workers thereby injured." *Jensen*, 469 N.W.2d at 372. In order for

the employee to maintain an action based on an employer's intentional tort, the "worker must ... demonstrate an actual intent by the employer to injure or a substantial certainty that injury will be the inevitable outcome of employer's conduct." *Id.* However, "substantial certainty should not be equated with substantial likelihood." *Id.* More specifically, the substantial certainty standard requires that the employer had actual knowledge of the dangerous condition and that the employer still required the employee to perform. *Harn*, 506 N.W.2d at 99.

■ [¶ 14.] Recently, this Court clarified the type of employer conduct that is not considered "intentional." *Fryer*, 2000 SD 125, ¶ 8, 616 N.W.2d at 105. Unless the employer's action is a "conscious and deliberate intent directed to the purpose of inflicting injury," the lone remedy is workers' compensation. *Id.* Moreover, even though the employer's conduct is careless, grossly negligent, reckless or wanton and even if that employer knowingly permits a hazardous work condition to exist, knowingly orders a claimant to perform an extremely dangerous job, or willfully fails to furnish a safe workplace, those acts still fall within the domain of workers' compensation. *Id.*

■ [¶ 15.] In addressing this issue, we note that the availability of "the intentional tort exception to workers' compensation is fact specific." *Harn*, 506 N.W.2d at 99. In prior caselaw, three elements have been helpful in determining if the employer acted intentionally. Those elements include: 1) whether the employer had actual knowledge of the dangerous condition; 2) if there was a substantial certainty that injury was to occur; and 3) the employer still required the employee to perform. *Id.* at 99. Therefore, it is relevant to compare the factual bases proffered by the estates to our prior cases in order to ad-

dress the alleged egregious conduct of Frank and Fred Mueller and the Mill.

[¶ 16.] In *Fryer*, an owner of a building employed Fryer to help clean the tile floor. 2000 SD 125, ¶ 2, 616 N.W.2d at 104. The employer/owner, having knowledge that another worker had previously become ill using hydrochloric acid as a cleaning solvent opted to use the chemical again and only told Fryer to wear gloves and to try and not inhale the substance. *Id.* ¶ 3. Over a course of three to four weeks, Fryer used the acid on numerous occasions and at times became lightheaded and nauseated. *Id.* ¶ 4. When she complained to her employer, he only told her to take a break and get some fresh air. *Id.* Finally, after using the acid in a small room with no ventilation, Fryer became ill and was hospitalized for four days with chest pains and skin irritation. *Id.* ¶ 5. In this situation, we held that "[the employer's] supervision of Fryer may have been negligent, reckless, or even wanton, but there [was] simply no showing that he intended to injure her." *Id.* ¶ 20. Consequently, Fryer's remedy was found in the workers' compensation system.

[¶ 17.] Likewise, in *Harn*, an old sawmill was utilized because the new sawmill was having some mechanical difficulties. 506 N.W.2d at 94. The old sawmill was never checked for proper safety devices and the plaintiff was injured when a piece of lumber flew out and struck him. *Id.* There, we held that even though the removal of the safety device made the injury probable, it did not rise to the level of a substantial certainty and thus employer's conduct did not meet the intentional tort exception. *Id.* at 100.

[¶ 18.] In *Brazones*, a group of employees were sent into an empty petroleum holding tank to clean the interior walls. 489 N.W.2d at 903. The employees were utilizing metal scrapers when it was thought a spark from the scraper ignited the fumes in the tank causing an explosion. *Id.* The explosion killed some employees and severely injured others. *Id.* The plaintiffs alleged the employer knew of the potential risk involved and that he equipped them with improper cleaning tools. *Id.* at 905. However, this Court concluded that even though there may have been knowledge of a probable risk of injury, the defendants were not "substantially certain that plaintiffs' injuries would be the inevitable outcome of defendants' conduct, much less to say that defendants *actually intended* plaintiffs' injuries." *Id.* at 907. Therefore, the remedy was found in the workers' compensation scheme.

[¶ 19.] In *Jensen*, the plaintiff was an "inexperienced, inadequately trained, 14–year–old boy ordered by his employer, without any warning of the danger, to perform a maintenance task which the employer knew from personal experience to be risky." 469 N.W.2d at 372. Once again, we determined that the injury was not substantially certain to occur and that the employer's conduct did not rise to the level of intentional tort. *Id.*

[¶ 20.] Finally, in *VerBouwens v. Hamm Wood Prod.*, 334 N.W.2d 874, 875 (S.D.1983) the plaintiff was injured by a saw designed and manufactured by his employer, which was not equipped with the proper safety devices. There we distinguished gross, willful, wanton, and reckless conduct (resulting in probable injury) from intentional conduct (resulting in substantially certain injury). *Id.* at 376. We held that the employer's acts did not rise to the level of intentional tort and determined that "to establish intentional conduct, *more than the knowledge and appreciation of risk is necessary;* the known danger must cease to become only a foreseeable risk which an ordinary, reasonable, prudent

person would avoid (ordinary negligence), and become a substantial certainty." *Id.*

■■■ [¶ 21.] In the case at hand, little evidence has been produced that either Frank or Fred Mueller knew there was a *possibility* of asphyxiation when inside the molasses tank, let alone a substantial certainty. It is true that a death occurred at the Mill in 1999 which prompted the Muellers to implement an OSHA approved safety plan. However, this death was due to a fall that occurred in an area other than the molasses tank. Also, even though the safety plan did have a specific section on precautions and possible dangers when confined areas were entered, the Muellers denied having specific knowledge of those sections. We do not categorize the Muellers' liability by what injuries they should have known were possible or even probable but, instead, look to their actual knowledge of a dangerous condition, the substantial certainty of an injury to occur, and their requirement of an employee to still perform. *Harn*, 506 N.W.2d at 100. Although the Muellers may have been negligent or even reckless, their actions did not ascend to the level of tortious conduct.

[¶ 22.] The estates also urge this Court to consider not only the safety plan and its directives, but also the fact that moments before the deaths occurred another employee had trouble breathing while being lowered into the tank. However, a person having trouble breathing when being lowered into an underground tank with only one exit does not necessarily mean that asphyxiation is substantially certain to occur. In fact, as stated by Harlan Richards himself, he had trouble breathing because he was claustrophobic and felt panicked. Coupled with the fact that Frank Mueller previously lowered his own head into the tank for about a minute with no difficulties, it is hard to fathom that the Muellers had any knowledge of *possible* injury, much less a substantial certainty that asphyxiation would occur.

[¶ 23.] Additional factors lending to the Muellers' lack of knowledge concerning asphyxiation while in the molasses tank were the length of time the tank had been utilized and the number of entries into the tank made by the Muellers, their immediate family members, and their employees. It is irrational to believe that if the Muellers knew there were noxious fumes in the tank that they would purposely expose themselves and their family members to them on numerous occasions. In fact, the molasses tank has been in operation for over forty years and was cleaned (by hand) approximately once a year without a hint of noxious fumes encompassing the area of the tank or complaints of illness after working in the tank. Other than the generalized precautions and warnings about confined spaces in the safety plan, the Muellers had no reason to suspect that the molasses could possibly ferment and release hydrogen sulfide.[4]

[¶ 24.] Under these circumstances, it is hard to believe that the Muellers should have known of the possibility of hydrogen sulfide being present in the tank. At most, their actions constituted negligence for not following the safety plan as approved by OSHA. However, this negligence did not rise to the level of intentional tort under the narrow exception to the exclusivity of workers' compensation. *See Harn*, 506 N.W.2d at 95; *Brazones*, 489 N.W.2d at 905; *Jensen*, 469 N.W.2d at 372; *VerBouwens*, 334 N.W.2d at 876. Although there may have been knowledge of

---

4. We note that the presence of the hydrogen sulfide due to fermented molasses was only a hypothesis given by the Hazardous Material Team and that no scientific study has been done to prove that position.

a probable risk of injury, that alone does not come within the intentional tort exception to workers' compensation coverage. *Brazones,* 489 N.W.2d at 907. The estates did not establish that there was a genuine issue of material fact as to the Muellers' intent to injure or the substantial certainty that injury would occur.

[¶ 25.] Therefore, the trial court's grant of summary judgment is affirmed.

[¶ 26.] MEIERHENRY, Justice, concurs.

[¶ 27.] ZINTER, Justice, concurs with writing.

[¶ 28.] GILBERTSON, Chief Justice, and KONENKAMP, Justice, concur in result.

[¶ 29.] ENG, Circuit Judge, for SABERS, Justice, disqualified.

ZINTER, Justice (concurring).

[¶ 30.] I concur in the Court's opinion and write only to comment upon the definition of an intentional tort.

[¶ 31.] As Justice Konenkamp points out, our cases have utilized a "substantial certainty" standard and a "virtual certainty" standard. *See infra* ¶¶ 34–35; *compare Brazones v. Prothe,* 489 N.W.2d 900 (S.D.1992) *and Jensen v. Sport Bowl, Inc.,* 469 N.W.2d 370 (S.D.1991), *with Harn v. Cont'l Lumber Co.,* 506 N.W.2d 91 (S.D. 1993) *and Fryer v. Kranz,* 2000 SD 125, 616 N.W.2d 102. Even if it were time to reconcile that conflict, I would wait for a more appropriate case to do so. In this case, not only did the Court apply the "substantial certainty" standard, but McMillin has not argued that *Harn* and *Kranz* should be reversed. Therefore, I would not re-examine those cases until this conflict has been fully briefed and argued.

GILBERTSON, Chief Justice (concurring in result).

[¶ 32.] In *Fryer v. Kranz,* we adhered to what has been characterized as the "virtual certainty" test for intentional torts. 2000 SD 125, ¶ 24, 616 N.W.2d 102, 108 (citing *Harn v. Continental Lumber Co.,* 506 N.W.2d 91, 95 (S.D.1993); *Brazones v. Prothe,* 489 N.W.2d 900, 905 (S.D.1992); *Jensen v. Sport Bowl, Inc.,* 469 N.W.2d 370, 372 (S.D.1991); *VerBouwens v. Hamm Wood Products,* 334 N.W.2d 874, 876 (S.D.1983)). In other words, "intent really means intent." *Id.* ¶ 27, 616 N.W.2d at 109 (citations omitted).

[¶ 33.] This is not an evolution of a common law doctrine. It is simply the statutory construction of SDCL 62–3–2 to define what constitutes an intentional tort. Since *Fryer* was decided by this Court, five sessions of the South Dakota Legislature have come and gone. We presume the Legislature acts with knowledge of our judicial decisions. *Sanford v. Sanford,* 2005 SD 34, ¶ 19, 694 N.W.2d 283, 289 (citations omitted). Were we to have misinterpreted in *Fryer* what the Legislature intended when it enacted SDCL 62–3–2, it had five chances to so state and adopt some other standard. Yet the statute remains intact, the same as the day we decided *Fryer.*

KONENKAMP, Justice (concurring in result).

[¶ 34.] I agree with the majority writing in its conclusion that there is little evidence in this tragic case to show that the employer knew there was a possibility, much less a substantial certainty, of asphyxiation. I write only to express my disagreement with the precedent the majority relies on: *Harn v. Contl Lumber Co.,* 506 N.W.2d 91 (S.D.1993), and *Fryer v. Kranz,* 2000 SD 125, 616 N.W.2d 102. In *Harn,* this Court, for the first time,

introduced the "virtual certainty" test for the intentional tort exception to workers compensation cases. *Harn,* 506 N.W.2d at 95, 100; SDCL 62–3–2 (intentional torts excepted). Again, in *Fryer,* the Court re-affirmed its use of this improper test. 2000 SD 125, 12, 616 N.W.2d at 106. Sub-stantial certainty is the appropriate stan-dard, not virtual certainty. *See Brazones v. Prothe,* 489 N.W.2d 900, 906 (S.D.1992); *Jensen v. Sport Bowl, Inc.,* 469 N.W.2d 370, 372 (S.D.1991); *VerBouwens v. Hamm Wood Prod.,* 334 N.W.2d 874, 876 (S.D.1983).

[¶ 35.] Section 8A of the Restatement of Torts provides: "The word 'intent' is used ... to denote that the actor desires to cause consequences of his act, *or that he believes that the consequences are* substan-tially certain to result from it." 1 RESTATE-MENT (SECOND) TORTS § 8A (1965). Com-ment (b) to that section explains that "[i]f the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Id.* § 8A cmt b.

[¶ 36.] Other jurisdictions have like-wise endorsed the use of the substantial certainty standard as a lesser burden than actual or virtual certainty. In *Turner v. PCR, Inc.,* 754 So.2d 683, 687, n4 (Fla 2000), *superseded by statute,* for example, the court stated: "We recognize that some courts have elevated the standard ... from substantial certainty to virtual certainty. Although we continue to find that substantial certainty requires a show-ing greater than gross negligence, we em-phasize that the appropriate standard is substantial certainty, not the heightened virtual certainty standard.... " *Id.* at n4 (citations omitted). *See Sorban v. Ster-ling Engineering Corp.,* 79 Conn.App. 444, 830 A.2d 372, 378 (2003) (specifically re-

jecting the virtual certainty standard in *Fryer* ). *See also Laidlow v. Hariton Mach. Co., Inc.,* 170 N.J. 602, 790 A.2d 884, 898 (N.J.2002); *Fyffe v. Jenos, Inc.,* 59 Ohio St.3d 115, 570 N.E.2d 1108, 1111– 12 (1991) *superseded by statute; Bazley v. Tortorich,* 397 So.2d 475, 482 (La.1981); *Mandolidis v. Elkins Indus., Inc.,* 161 W.Va. 695, 246 S.E.2d 907, 914–15 (W.Va. 1978), *superseded by statute; Gallapoo v. Wal–Mart Stores, Inc.,* 197 W.Va. 172, 475 S.E.2d 172, 175 (W.Va.1996).

[¶ 37.] To the extent that they use the virtual certainty test, it is time to discard *Harn* and *Fryer* and return to the correct standard for assessing intentional conduct in worker's compensation cases.