#29639, #29686-aff in pt & rev in pt-PJD
**2022 S.D. 49**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

LYNN ALTHOFF, as Personal
Representative of the Estate of
Justin Althoff,                                                    Plaintiff and Appellee,

v.

PRO-TEC ROOFING, INC.,                                     Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBERT L. SPEARS
Judge

* * * *

RICHARD L. TRAVIS
PAUL W. COPPOCK of
May & Johnson, P.C.
Sioux Falls, South Dakota                          Attorneys for defendant and
                                                   appellant.


LEE C. "KIT" MCCAHREN of
Olinger, Lovald, McCahren
   & Van Camp, P.C.
Pierre, South Dakota                               Attorneys for plaintiff
                                                   and appellee.

* * * *

                                                   ARGUED
                                                   FEBRUARY 15, 2022
                                                   OPINION FILED **08/10/22**

DEVANEY, Justice

[¶1.] While working on the roof of a building for a subcontractor, an employee fell off the roof and tragically died as a result. His estate instituted a tort suit against the employer, and the employer asserted that the estate's remedies were limited to those available under the South Dakota Workers' Compensation Act. On cross-motions for summary judgment, the circuit court denied both parties' motions, concluding that material issues of fact were in dispute on the question whether it was substantially certain that an injury would result from the employer's failure to train its employees and provide adequate safety equipment. Because we conclude, on the undisputed facts presented, that the employer was entitled to summary judgment, we affirm in part and reverse in part.

## Factual and Procedural Background

[¶2.] Pro-Tec Roofing, Inc. entered into a subcontract with a general contractor for the construction of a community center in Watertown, South Dakota. Pro-Tec hired Justin Althoff to work on the community center project. After he was hired, Pro-Tec provided him a copy of the company's safety and health manual but did not provide him any formal safety training. While Althoff was working on the roof of the community center on April 21, 2016, he got too close to the edge of the building and fell off the roof. Althoff died as result of the fall, and Pro-Tec paid workers' compensation benefits accordingly. Althoff's estate (Estate) later brought a tort suit against Pro-Tec, alleging that Althoff's death arose from Pro-Tec's intentional acts of not following OSHA regulations and its own safety rules. The Estate did not identify a particular intentional tort; instead, it asserted that Pro-Tec

employees' "intentional actions and willful misconduct were the proximate cause of Justin Althoff's injuries and death."

[¶3.]     Relevant to the issues here, it is undisputed that Pro-Tec did not provide Althoff or the other employees a safety harness to wear while working on the roof.  Instead, Pro-Tec used a warning line system.  However, Pro-Tec's placement of the warning line did not meet the Occupational Safety and Health Administration's (OSHA) standards.  Further, Pro-Tec did not have a designated person monitoring employees working near or outside the partially erected warning line as required by OSHA regulations.  Pro-Tec claimed that it operated under the belief that it was every employee's responsibility to watch out for each other.  In particular to the circumstances here, Pro-Tec claimed that just prior to Althoff's fall, a co-worker warned him that he was too close to the edge.

[¶4.]     After the fall, OSHA conducted an investigation and issued citations to Pro-Tec and imposed monetary penalties for, among other things, not adequately training employees related to fall hazards and not using a proper fall prevention system.  One citation, related to Pro-Tec's failure to properly implement its warning line system and failure to use a dedicated safety monitor, was deemed to be a "willful" violation.

[¶5.]     After the parties conducted discovery, the Estate amended its complaint and identified that OSHA had issued Pro-Tec three citations prior to Althoff's April 2016 fall.  The first citation, issued on September 10, 2009, occurred after OSHA conducted an unannounced job site inspection.  OSHA determined that Pro-Tec did not have "[e]ach platform on all working levels of scaffolds" "fully

planked or decked between the front uprights and guardrail supports." The second and third citations, deemed to be "serious," were issued on January 11, 2011 and July 2, 2012. These also occurred after unannounced inspections by OSHA wherein OSHA discovered employees working on low-slope roofs without "guardrail systems, safety net systems, personal fall arrest systems, or a combination of warning line system and personal fall arrest system, or warning line system and safety monitoring system[.]" In response to the January 2011 citation, Pro-Tec agreed to implement a safety and health program that complies with OSHA's safety and health management guidelines. Pro-Tec also adopted a fall prevention program, outlining fall prevention systems and training programs to be provided to employees. In the July 2012 citation, OSHA specifically noted that Pro-Tec had been previously cited for the same violation in January 2011.

[¶6.]     In its amended complaint, the Estate also quoted language from Pro-Tec's safety and health manual that required employees to "follow OSHA, State, Federal, and Pro-Tec Roofing, Inc. standards at all times" and "[u]se safety harness[es] when close to the hazard of falling."[1] The Estate noted that pursuant to the manual, the company's officers and foremen were responsible for making sure that employees follow Pro-Tec's policies and that Pro-Tec meets all OSHA and local safety standards. The Estate further noted that within the training section of the

---

1.    Although the Estate quoted multiple provisions of the manual in its statement of undisputed material facts, the Estate did not always quote the entirety of a provision. The Estate also did not include the entire manual in the record. It is therefore difficult to interpret how or whether some of the provisions relied on by the Estate apply to the circumstances of this case.

manual, Pro-Tec had adopted a fall protection program that identified and required compliance with the relevant OSHA guidelines for preventing falls.

[¶7.] In regard to Pro-Tec's role in Althoff's fall, the Estate quoted testimony from interviews by an OSHA representative conducted with Pro-Tec's employees during OSHA's investigation after the fall. The Estate then relied on this testimony as support for the claim that Pro-Tec "was clearly and obviously aware that fall protection was required by [the company's] own rules and OSHA statutes and that safety harnesses were not used or present[.]"[2] According to the Estate, Pro-Tec's failure to provide the required safety measures meant that "serious injury or death was absolutely certain."

[¶8.] Pro-Tec filed a motion for summary judgment, asserting that under SDCL 62-3-2, workers' compensation is the Estate's exclusive remedy because Althoff's death occurred in the course of his employment. In response, the Estate argued that because Pro-Tec deliberately failed to provide Althoff with a safety harness as required by its internal safety rules and policies, the exception to SDCL 62-3-2 for intentional torts applied. The Estate filed a cross-motion for summary judgment, claiming that the undisputed facts establish that Pro-Tec's "intentional acts of willfully choosing not to provide an operable fall protection system" after its OSHA citations and with full knowledge of its violation of the company's safety rules requirements "removes this case from the purview of SDCL 62-3-2."

---

2. The portions of Pro-Tec's fall protection program quoted by the Estate refer to the OSHA regulations describing different methods to protect employees engaged in roofing activities on low-slope roofs. Not every method requires the use of safety harnesses. One method, used by Pro-Tec, utilizes a warning line system combined with a safety monitoring system.

[¶9.] After a hearing, the circuit court issued a memorandum decision. The court recognized that workers' compensation would be the Estate's only remedy unless the injury arose from an employer's intentional tort and ultimately concluded that neither the Estate nor Pro-Tec were entitled to summary judgment. In denying the Estate summary judgment, the court determined that the Estate could not, simply from the OSHA violations and Pro-Tec's violation of its own safety rules, prove that it was substantially certain that Althoff would fall off the roof that day. However, in denying Pro-Tec summary judgment, the court determined that the Estate identified material issues of fact in dispute on the question whether "Pro-Tec's actions (or omissions) at its construction job sites were substantially certain to cause an injury or death of an employee within the intentional tort exception" because of the evidence that Pro-Tec "willfully failed to furnish a safe workplace for its employees" who were "performing an extremely dangerous job." The court found it "difficult to believe that the South Dakota Legislature intended to provide armor to an employer with the practical effect of complete tort immunity, when that very employer intentionally and repeatedly failed to adequately train its employees and provide appropriate safety equipment in dangerous construction activities such as roofing."

[¶10.] This Court granted Pro-Tec's petition for permission to take a discretionary appeal challenging the circuit court's intermediate order denying Pro-Tec summary judgment. *See* SDCL 15-26A-13; SDCL 15-26A-3(6). The Estate, by notice of review, asserts that the circuit court erred in denying its motion for summary judgment.

## Standard of Review

[¶11.] As stated in *Syrstad v. Syrstad,*

"We review de novo a circuit court's entry of summary judgment." *Tammen v. Tronvold*, 2021 S.D. 56, ¶ 17, 965 N.W.2d 161, 168. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." SDCL 15-6-56(c). We view the evidence and all reasonable inferences in a light most favorable to the nonmoving party and resolve reasonable doubts against the moving party. *Strassburg v. Citizens State Bank*, 1998 S.D. 72, ¶ 5, 581 N.W.2d 510, 513. Our task on appeal is to "determine whether the moving party has demonstrated the absence of any genuine issue of material fact and entitlement to judgment on the merits as a matter of law." *Bernie v. Cath. Diocese of Sioux Falls*, 2012 S.D. 63, ¶ 7, 821 N.W.2d 232, 237 (citation omitted).

2021 S.D. 67, ¶ 13, 968 N.W.2d 207, 212.

## Analysis and Decision

[¶12.] Under SDCL 62-3-2,

The rights and remedies granted to an employee subject to this title, on account of personal injury or death arising out of and in the course of employment, *shall exclude all other rights and remedies* of the employee, the employee's personal representatives, dependents, or next of kin, on account of such injury or death against the employer or any employee, partner, officer, or director of the employer, *except rights and remedies arising from intentional tort.*

(Emphasis added.) In *McMillin v. Mueller*, which examined the intentional tort exception, this Court noted that "workers' compensation is meant to be the exclusive remedy for all injuries that occur on the job except for those intentionally inflicted by the employer." 2005 S.D. 41, ¶ 12, 695 N.W.2d 217, 222. Therefore, to bring a tort suit against employers, workers "must allege facts that plausibly

demonstrate an actual intent by the employer to injure or a substantial certainty that injury will be the inevitable outcome of employer's conduct." *Harn v. Continental Lumber Co.*, 506 N.W.2d 91, 95 (S.D. 1993); *see also Fryer v. Kranz*, 2000 S.D. 125, ¶ 11, 616 N.W.2d 102, 106 (quoting *Jensen v. Sport Bowl, Inc.*, 469 N.W.2d 370, 372 (S.D. 1991)). "To establish intentional conduct, *more than the knowledge and appreciation of risk is necessary;* the known danger must . . . become a *substantial certainty*." *Jensen*, 469 N.W.2d at 372 (citation omitted); *McMillin*, 2005 S.D. 41, ¶ 20, 695 N.W.2d at 223–24.

### *Clarification of the applicable standards*

[¶13.]      Before examining whether summary judgment was properly denied here, a review of this Court's past cases reflects an unresolved debate regarding whether employees seeking to avoid the exclusivity provision in SDCL 62-3-2 must prove that it was *substantially* certain or *virtually* certain that an injury would occur as a result of an employer's conduct.  In each case prior to and after *Harn*, the Court has referred to what has been called the "substantial certainty" standard. *See, e.g.*, *VerBouwens v. Hamm Wood Products*, 334 N.W.2d 874, 876 (S.D. 1983); *Jensen*, 469 N.W.2d at 372; *Brazones v. Prothe*, 489 N.W.2d 900, 905 (S.D. 1992); *Harn*, 506 N.W.2d at 95; *Benson v. Goble*, 1999 S.D. 38, ¶ 19, 593 N.W.2d 402, 406; *Fryer*, 2000 S.D. 125, ¶ 11, 616 N.W.2d at 106; *McMillin*, 2005 S.D. 41, ¶ 12, 695 N.W.2d at 222.  However, in *Harn*, the Court also indicated that it would follow "Michigan's direction" and apply "a strict interpretation of substantial certainty" such that "[s]ubstantial certainty of injury to the employee should be equated with *virtual certainty* to be considered an intentional tort."  *See* 506 N.W.2d at 100

(emphasis added). The Court then explained that this stringent standard—virtual certainty—refers to a scenario "where the employer actually knew of the danger and that injury was substantially certain (virtually certain) to occur[.]" *Id.* Justice Sabers, in a special writing in *Harn*, criticized the Court's use of the phrase "virtual certainty." 506 N.W.2d at 100 (Sabers, J., concurring specially). He expressed the view that the existing substantial certainty standard previously applied by the Court "is solid and workable" and should not "be altered to mean 'virtually certain.'" *Id.*

[¶14.] The Court's next decision examining the intentional tort exception, *Benson*, did not refer to the virtual certainty language, although the Court quoted *Harn*. *See* 1999 S.D. 38, ¶ 19, 593 N.W.2d at 406. But then in *Fryer*, decided the year following *Benson*, the majority opinion quoted the substantial certainty standard, *see* 2000 S.D. 125, ¶ 13, 616 N.W.2d at 106, while at the same time applying language from *Harn* that equated substantial certainty with virtual certainty that injury would occur, *see* 2000 S.D. 125, ¶¶ 21–24, 616 N.W.2d at 107–08. Justice Sabers dissented in *Fryer*, noting that "[t]he majority opinion confusingly refers to both 'substantial certainty' and 'virtual certainty' throughout its opinion." *Id.* ¶ 31, 616 N.W.2d at 109 (Sabers, J., dissenting). He expressed the view that virtual certainty is a heightened standard and that "[t]he majority opinion confusingly leaves the bench and bar to wrestle with any possible implications and reaches the wrong decision by use of such test." *Id.*

[¶15.] Justice Konenkamp also dissented. He claimed that "[t]he term 'virtual certainty,' used repeatedly in the majority writing, somehow crept into our

precedent, but its lineage is obscure." *Id.* ¶ 39, 616 N.W.2d at 111 (Konenkamp, J., dissenting). He further noted that "[i]n human behavior few things are 'virtually certain' to follow any particular deed." *Id.* While Justice Konenkamp agreed that "[t]he intentional tort exception should be narrowly construed," he disagreed that it should be so narrow that it requires "proof that employers must foresee with 'virtual certainty' the results of their deliberate acts." *Id.* (citation omitted).

[¶16.] Five years later, the Court issued *McMillin*, 2005 S.D. 41, 695 N.W.2d 217. When concluding that summary judgment was properly granted, the majority opinion did not refer to the virtual certainty standard or acknowledge the prior special writings concerning the debate between whether a virtual or substantial certainty standard applies. The Court quoted only the substantial certainty standard expressed in this Court's past cases when concluding that the evidence "did not establish that there was a genuine issue of material fact as to the [employer's] intent to injure or the substantial certainty that injury would occur." *Id.* ¶ 24, 695 N.W.2d at 225. However, in determining that there were insufficient facts to support a finding of substantial certainty, the Court cited language from the *Harn* opinion that applied the virtual certainty standard. *Id.* ¶ 21, 695 N.W.2d at 224 (citing *Harn*, 506 N.W.2d at 100). Justice Zinter concurred, and Chief Justice Gilbertson and Justice Konenkamp concurred in result only.

[¶17.] In his concurrence, Chief Justice Gilbertson indicated that he would have applied the virtual certainty standard espoused first in *Harn* and used in *Fryer*. *See* 2005 S.D. 41, ¶ 32, 695 N.W.2d at 225 (Gilbertson, C.J., concurring in result). In his view, the use of a virtual certainty standard "is not an evolution of a

common law doctrine." *Id.* ¶ 33. Rather, "[i]t is simply the statutory construction of SDCL 62-3-2 to define what constitutes an intentional tort." *Id.*

[¶18.] Justice Konenkamp, in his concurrence, reiterated his view expressed in his dissent in *Fryer* that the proper standard is substantial, not virtual, certainty. *Id.* ¶ 34, 695 N.W.2d at 226. In support, he quoted the Restatement (Second) of Torts § 8A (1956) explaining that "[t]he word 'intent' is used . . . to denote that the actor desires to cause consequences of his act, *or that he believes that the consequences are* substantially certain to result from it." *Id.* ¶ 35. He also noted that other courts use the substantial certainty standard, which carries a lesser burden than actual or virtual certainty. *Id.* ¶ 36 (citing cases). In Justice Konenkamp's view, "[t]o the extent that they use the virtual certainty test, it is time to discard *Harn* and *Fryer* and return to the correct standard for assessing intentional conduct in worker's compensation cases." *Id.* ¶ 37.

[¶19.] In the third concurring opinion in *McMillen*, Justice Zinter acknowledged that this Court has used both a substantial certainty standard and a virtual certainty standard. *Id.* ¶ 31, 695 N.W.2d at 225 (Zinter, J., concurring). However, he stated he "would not re-examine those cases" because the "conflict had not been fully briefed and argued" and the majority opinion in *McMillin* had applied only the substantial certainty standard. *Id.* In his view, the Court should "wait for a more appropriate case" "to reconcile that conflict[.]" *Id.*

[¶20.] This case presents the occasion to do so. While the circuit court applied only the substantial certainty standard and did not refer to the virtual certainty standard, on appeal, Pro-Tec quotes and relies on the virtual certainty

language from *Harn*. Pro-Tec also asserts, contrary to *Harn* and the special writings in other cases, that the virtual certainty and substantial certainty standards "are not dualistic competing standards"; rather, they "are one and the same[.]" The Estate does not respond to this contention or refer to the virtual certainty standard in any regard.

[¶21.]     As has been established by our past cases, virtual certainty is not the same as substantial certainty. In fact, the Court in *Harn* recognized as much when it related in a footnote that the Michigan legislature had adopted a stricter standard in response to the Michigan Supreme Court's adoption of the substantial certainty standard "requiring that the employer have actual (not constructive) knowledge that injury was certain (not substantially certain) to occur[.]" *See* 506 N.W.2d at 96 n.1. However, while the Court in *Harn* indicated its intent to follow Michigan's direction, it is not so clear from the Court's ultimate conclusion how it applied a "virtual certainty" standard. *See* 506 N.W.2d at 100 (holding that "[t]he facts presented in this case do not demonstrate that the employer actually intended injury or that Harn's injuries were *substantially certain* to occur or be the inevitable outcome of the employer's acts" (emphasis added)). The cases after *Harn* similarly quoted the substantial certainty standard, even though two cases referred to the virtual certainty language from *Harn*. It is noteworthy that the Court in *McMillin*, the most recent case to address the workers' compensation exclusivity exception, did not use the phrase "virtual certainty" in resolving the appeal.

[¶22.]     Because of the reference to both standards in *Harn* and in some of this Court's subsequent workers' compensation cases and also because of the

acknowledgement by three members of the Court in *McMillin* that these standards are conflicting, we take this opportunity to resolve the debate regarding which standard applies. To begin, SDCL 62-3-2 does not contain the more stringent language adopted by the Michigan legislature in response to the Michigan court's adoption of the substantial certainty standard.[3] Our statute refers only to an "intentional tort." And the substantial certainty standard the Court first identified in *VerBouwens*, 334 N.W.2d at 876, aligns with the mens rea the Court has required to prove an intentional tort: "the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." Restatement (Second) of Torts §8A (1965); *see Frey v. Kouf*, 484 N.W.2d 864, 867 (S.D. 1992) (citing the Restatement when relating definitions of the word "intentional"). Therefore, the substantial certainty standard adopted by this Court prior to *Harn* and applied in *McMillin* and other workers' compensation cases is the appropriate standard to be applied. Under this standard, "[t]o establish intentional conduct, more than the knowledge and appreciation of risk is necessary; the known danger must . . . become a substantial certainty." *Jensen*, 469 N.W.2d at 372

---

3. The Michigan statute provides in relevant part:

> The only exception to this exclusive remedy is an intentional tort. An intentional tort shall exist only when an employee is injured as a result of a deliberate act of the employer and the employer specifically intended an injury. An employer shall be deemed to have intended to injure if the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge.

M.C.L.A. 418.131.

(emphasis omitted) (quoting *VerBouwens*, 334 N.W.2d at 876); *see also Fryer*, 2000 S.D. 125, ¶ 12, 616 N.W.2d at 106; *Harn*, 506 N.W.2d at 95.

[¶23.]     We further take this opportunity to address other language originating in *VerBouwens* that conflates concepts encompassed in negligence and intentional tort standards. *VerBouwens* described intentional conduct as that which occurs when "an *ordinary, reasonable, prudent person* would believe an injury was *substantially certain* to result from his conduct." 334 N.W.2d at 876 (first emphasis added). This formulation of the standard lacks internal congruence because, by definition, a reasonable person presumably would not commit an intentional tort.

[¶24.]     The appellate briefs in this case quote the language from *VerBouwens*, and a review of this Court's past workers' compensation cases reveals that a modified version of the language has been repeated in multiple cases. *See Jensen*, 469 N.W.2d at 371 (quoting the language from *VerBouwens* that "workers may bring suit against their employers at common law only 'when an ordinary, reasonable, prudent person would believe an injury was substantially certain to result from [the employer's] conduct'" (emphasis omitted)); *Brazones*, 489 N.W.2d at 905–06 (same); *Harn*, 506 N.W.2d at 97 (same); *Benson*, 1999 S.D. 38, ¶ 19, 593 N.W.2d at 406 (same); *Fryer*, 2000 S.D. 125, ¶ 12, 616 N.W.2d at 106 (same); *McMillin*, 2005 S.D. 41, ¶¶ 12, 20, 695 N.W.2d at 222, 223–24 (same).

[¶25.]     Although the latter part of the *VerBouwens* quote accurately refers to a substantial certainty requirement, which must be proven to establish an intentional tort, the reference to what an ordinary, reasonable, prudent person would believe in examining the employer's conduct is improper because it derives from the standard

governing what constitutes negligence. The negligence standard requires a lower mens rea than that required to prove either reckless conduct (which requires the actor at issue, not just a reasonable person, to know of the risk but consciously disregard it) or intentional conduct (requiring the actor to have the intent to injure or actual knowledge that an injury is substantially certain to occur).

[¶26.] Even though the Court's past cases quoted language applicable to a negligence standard, it appears that the Court properly focused on what the employer actually knew, rather than what an ordinary, reasonable, prudent person would know, when determining whether the facts in each case met the substantial certainty standard. In future cases, courts and parties should refrain from including the language from *VerBouwens* regarding an ordinary, reasonable, prudent person when relating the standard for what constitutes intentional conduct.

### Whether the circuit court erred in denying both parties' motions for summary judgment

[¶27.] Pro-Tec contends that the circuit court misapplied the law to the undisputed material facts in this case. In particular, Pro-Tec directs this Court to the circuit court's statement in its memorandum decision that "Plaintiff here cannot prove that it was a substantial certainty that Althoff would fall off the roof at a job site that day[.]" In Pro-Tec's view, the circuit court should have, on this determination alone, granted its motion for summary judgment. Pro-Tec further claims that the circuit court erred in denying its motion for summary judgment because the prior OSHA violations "are immaterial to the question of exclusivity" and did not demonstrate a material issue of fact in dispute on the question whether

"Pro-Tec had actual knowledge of a dangerous condition on the roof of the Watertown Community Center and that the condition was substantially certain to lead precisely to Althoff's fall." Rather, according to Pro-Tec, its OSHA violations and its violation of its own safety policies on the day of and prior to Althoff's fall established, at most, that Pro-Tec acted negligently or recklessly on April 21, 2016.

[¶28.] In response, the Estate asserts that it does not "have to prove that Pro-Tec knows which unharnessed employee is going to fall on any given day at any particular time[.]" Rather, in the Estate's view, because it is absolutely certain that a fall from the roof would result in serious injury or death, the Estate need only establish that Pro-Tec's "foremen willfully, wantonly and knowingly broke their own rules and their own <u>written safety program</u> which mirrors, cites and follows the federal safety statutes." (Emphasis added by the Estate.) According to the Estate, because Pro-Tec "was absolutely certain of what [it was] exposing Althoff to by intentionally failing to harness him or provide him an operable fall protection system" summary judgment should have been entered in its favor. Alternatively, the Estate claims that the circuit court properly denied Pro-Tec's motion for summary judgment because there is a genuine issue of material fact in dispute.

[¶29.] In past cases, the Court has explained "that the availability of 'the intentional tort exception to workers' compensation is fact specific.'" *See McMillin*, 2005 S.D. 41, ¶ 15, 695 N.W.2d at 222 (quoting *Harn*, 506 N.W.2d at 99); *see also Fryer*, 2000 S.D. 125, ¶ 15, 616 N.W.2d at 107 (same). As such, the Court has found it helpful "to compare the factual bases proffered" in the current case "to our prior

cases[.]" *McMillin*, 2005 S.D. 41, ¶ 15, 695 N.W.2d at 222; *see also Fryer*, 2000 S.D. 125, ¶ 15, 616 N.W.2d at 107; *Benson*, 1999 S.D. 38, ¶ 20, 593 N.W.2d at 407.

[¶30.]     In *VerBouwens*, the plaintiff was injured by a saw designed and manufactured by his employer. 334 N.W.2d at 875. The saw lacked proper safety equipment, and in seeking to avoid the exclusivity of workers' compensation, the plaintiff relied on "a theory of intentional tort" based on the employer's knowledge of the saw's dangerous condition and claimed that the employer's knowledge was sufficient to establish willful, wanton, and reckless conduct. *Id.* The Court disagreed, holding that "[t]o establish intentional conduct, *more than the knowledge and appreciation of risk is necessary*; the known danger must . . . become a *substantial certainty*." *Id.* at 876. The Court then concluded that although it "can hypothesize that [the employer] may have known of a probable risk of injury from its saw design[,]" the Court could not, on the record before it, "say [the employer] was *substantially certain* that [the employee's] injury would result." *Id.*

[¶31.]     This well-established line of reasoning in *VerBouwens* has been applied in subsequent cases. *See, e.g.*, *Jensen*, 469 N.W.2d at 370–73 (holding that plaintiff employee's injury, the loss of a finger in a bowling alley pin-setting machine, was not substantially certain to result from employer's failure to adequately train and warn employees of known risks related to the tasks being performed by the injured employee); *Brazones*, 489 N.W.2d at 906–07 (affirming summary judgment for employers after holding that it was not substantially certain, from employers' knowledge of potentially unsafe conditions inside a petroleum storage tank being cleaned by employees without proper training and equipment, that employees

would be killed or injured in a tank explosion while completing such tasks); *Harn*, 506 N.W.2d at 100 (similarly affirming summary judgment for employer, determining that although the anti-kickback device at an old saw mill had been intentionally disengaged to allow for continued lumber production, employee's injuries from a board kicking back were not substantially certain to occur from employer's conduct); *Fryer*, 2000 S.D. 125, ¶ 28, 616 N.W.2d at 109 (holding that employer's conduct directing employee to continue using a cleaning solvent containing hydrochloric acid in a poorly ventilated room, despite the fact that employer knew employee had previously become light-headed and nauseous after using this solvent, "was clearly negligent, probably reckless and possibly wanton," but "it does not amount to an intentional act").

[¶32.]     In *McMillin*, the estates of two employees (Duane and Roger) brought suit against Mueller Feed Mill, Inc. and Frank and Fred Mueller, individually and as agents of the company, (collectively, the Muellers) after the employees suffocated inside an underground molasses tank. 2005 S.D. 41, ¶ 8, 695 N.W.2d at 220. The employees were engaged in the yearly cleaning of the molasses tank. *Id.* ¶ 3. When one employee was lowered inside but had not yet reached the bottom, Frank Mueller heard him state that he needed to be taken out because he could not breathe. *Id.* ¶ 5. Frank then asked Duane and Roger to clean the tank. After Roger lowered Duane into the tank with a forklift, Roger looked into the tank and noticed Duane lying face down at the bottom. *Id.* ¶ 6. Roger yelled for help, and Frank, who had gone back to his office, came back to assist. *Id.* While Frank left to get a harness to remove Duane from the tank, Roger was lowered into the tank, and

as he was trying to turn over Duane, he collapsed on top of him. *Id.* Frank called 911, and after emergency personnel arrived, Roger and Duane were pronounced dead at the scene and the cause of death was determined to be "'asphyxiation/ aspiration' and/or 'suffocation secondary to exposure to an environment high in hydrogen sulfide and low in oxygen.'" *Id.* ¶ 7. It was suggested that high levels of carbon dioxide were produced because "the molasses fermented in the hot, dry summer which was above the average for heat and dryness." *Id.*

[¶33.] The Muellers moved for summary judgment against the estates, alleging that workers' compensation was the estates' exclusive remedy. *Id.* ¶ 8. In response, the estates "argued that a 1999 Safety Plan, implemented by the Mill and submitted to the Occupational Safety and Health Administration (OSHA), removed the recovery from the exclusivity of the workers' compensation laws and into the realm of intentional tort law." *Id.* The estates also asserted that the intentional tort exception applied because "the safety plan was in effect, the [employers] knew of the probable harm of entering the tank without a breathing apparatus and [the employers] deliberately put their employees at risk." *Id.*

[¶34.] After reviewing the applicable law and this Court's past cases, we concluded that "little evidence has been produced that either Frank or Fred Mueller knew there was a *possibility* of asphyxiation when inside the molasses tank, let alone a substantial certainty." *Id.* ¶ 21, 695 N.W.2d at 224. The Court noted that a death had occurred at the Mill previously and that the employer thereafter implemented a safety plan approved by OSHA. *Id.* However, this prior death was

not due to asphyxiation; it "was due to a fall that occurred in an area other than the molasses tank." *Id.*

[¶35.]      Further, although the evidence established that moments before the deaths occurred another employee had trouble breathing inside the tank, the Court determined that "a person having trouble breathing when being lowered into an underground tank with only one exit does not necessarily mean that asphyxiation is substantially certain to occur." *Id.* ¶ 22.  In support of this determination, the Court noted that the other employee stated that "he had trouble breathing because he was claustrophobic and felt panicked." *Id.*  The Court also considered that Frank Mueller had previously lowered his head into the tank without experiencing difficulties.  *Id.*  Finally, the Court referred to the lengthy period the molasses tank had been in operation and the numerous entries into the tank by the Muellers, their family members, and employees that had occurred without complaints of noxious fumes or illness.  *Id.* ¶ 23.

[¶36.]      Ultimately, the Court concluded that "[a]t most, [the Muellers'] actions constituted negligence for not following the safety plan as approved by OSHA." *Id.* ¶ 24.  The Court further concluded that "[a]lthough there may have been knowledge of a probable risk of injury, that alone does not come within the intentional tort exception to workers' compensation coverage." *Id.* ¶ 24, 695 N.W.2d at 224–25.  The Court therefore affirmed summary judgment because the employees' estates had not established that there were "genuine issue[s] of material fact as to the Muellers' intent to injure or the substantial certainty that injury would occur." *Id.*

[¶37.]     In the present case, like in *McMillin*, the Estate relies on Pro-Tec's prior OSHA violations and repeated failure to follow its own safety policies and programs. In the Estate's view, "[t]he operative fact is that Pro-Tec's foremen's deliberate daily failure to furnish all employees and Althoff [with a] safety harness guaranteed the first 33-foot fall would result in death." This premise is unsound for two reasons. First, the Estate's focus on the lack of a safety harness ignores that Pro-Tec's safety policies and the applicable OSHA regulations allowed for the use of an alternative system to prevent falls, including the warning line system Pro-Tec attempted to use, but failed to fully implement, here. Second, and more importantly, the Estate's focus on whether a death was certain to result from a fall off a 33-foot roof overlooks the preceding question most relevant here—whether it was substantially certain, from Pro-Tec's decision not to fully implement a warning line system, that an employee would *fall off the roof*.[4]

---

4.     The Estate's further reliance on SDCL 62-4-37 is misplaced. The statute provides:

> No compensation may be allowed for any injury or death due to the *employee's willful misconduct*, including intentional self-inflicted injury, intoxication, illegal use of any schedule I or schedule II drug, or willful failure or refusal to use a safety appliance furnished by the employer, or to perform a duty required by statute. The burden of proof under this section is on the defendant employer.

*Id.* (emphasis added). By its plain language, the statute governs the question of when an *employee's* conduct bars the employee from recovering workers' compensation benefits, not whether an employee may avoid the exclusivity provision in SDCL 62-3-2. Moreover, "willful misconduct" has been defined more broadly than intentional conduct to include acts done "with reckless disregard of [their] probable consequences." *Bonebright v. City of Miller*, 2020 S.D. 16, ¶ 17, 941 N.W.2d 231, 236 (citation omitted).

[¶38.]    As to this question, the Estate contends that Pro-Tec acted with the requisite knowledge based on its pattern of past conduct, namely, its prior OSHA violations. To support this contention, the Estate cites an Oklahoma case involving an employee falling off a roof where the Supreme Court of Oklahoma remanded for a determination of whether the substantial certainty standard could be met. *See Wells v. Oklahoma Roofing & Sheet Metal, LLC*, 457 P.3d 1020, 1029 (Okla. 2019). Notably, the court in *Wells* did not examine the facts in the record related to the employee's fall in its discussion of the appropriate standard to apply when considering the intentional tort exception to the workers' compensation exclusivity provision. Rather, the issue before the court pertained to a state law constitutional question associated with Oklahoma's exclusivity statute. *See id.* at 1026–29.

[¶39.]    The Estate nevertheless highlights the Oklahoma court's explanation that under this standard, its "focus [is] not limited to a particular employee and the injury sustained; but rather, the employer's intentional acts or willful failure to act[.]" *Id.* at 1025. The Estate further points to the Oklahoma court's determination that "[a]n employer's knowledge may be inferred from the employer's conduct and all the surrounding circumstances" and that such conduct and "circumstances can be established through circumstantial evidence." *Id.* at 1027 (emphasis omitted).

[¶40.]    Pro-Tec, on the other hand, asserts that the Estate cannot rely on the prior OSHA violations to meet its burden because those violations did not relate to the Watertown project and that the relevant evidence must be "narrowly focused on the circumstances immediately surrounding Althoff's fall[.]" On the contrary, to

avoid summary judgment, the Estate can rely on any evidence from which it could reasonably be inferred that Pro-Tec acted with the knowledge that a fall was substantially certain to result from its conduct. Such evidence could include Pro-Tec's past OSHA violations regarding different projects that involved the same circumstances known to be present on the roof in question. Therefore, even if this evidence is insufficient in and of itself to meet the substantial certainty standard, it is nevertheless relevant to the question of what the employer knew.

[¶41.] In reviewing the Estate's evidence of Pro-Tec's relevant conduct, it is undisputed that Pro-Tec had multiple prior OSHA violations and a history of failing to follow its safety policies and programs. It is similarly undisputed that Pro-Tec knew of the potential dangers inherent to roofing based on its two prior OSHA violations that were deemed "serious" and pertained to safety issues related to preventing falls from roofs, the very same issues at play here. The Estate's evidence further establishes that despite these prior OSHA violations, Pro-Tec chose not to fully implement a fall prevention system as required under OSHA and its own safety policies.

[¶42.] However, the Estate's evidence does not establish intentional conduct, namely that Pro-Tec knew that its decision to not strictly comply with required safety measures was substantially certain to result in an employee falling off the roof. None of Pro-Tec's prior OSHA violations for failing to implement an appropriate fall prevention system involved an injury or death, and there is no evidence that a Pro-Tec employee has ever fallen off a roof at a construction site.

[¶43.]     Although Althoff's death is undoubtedly tragic, at most, the Estate's evidence of Pro-Tec's past conduct establishes that Pro-Tec's conduct on the date in question was reckless (a conscious disregard of a known risk) or negligent (a failure to exercise the care of an ordinary, reasonable, and prudent person despite a foreseeable risk of injury). But as the Court in *Fryer* explained, only "[w]hen an employer intends to commit injury, as opposed to negligently or recklessly committing it," does "the rationale for embracing workers' compensation disappear[ ]." 2000 S.D. 125, ¶ 10, 616 N.W.2d at 105. "To establish intentional conduct, more than the knowledge and appreciation of risk is necessary[.]" *See also VerBouwens*, 334 N.W.2d at 876. Therefore, while the circuit court properly denied the Estate's motion for summary judgment by determining that although "[t]here may have been a substantial *likelihood* that an employee could fall to his death," "[a] substantial *likelihood* is not substantial *certainty*[,]" the court erred in denying Pro-Tec's motion for summary judgment. Pro-Tec's knowledge that a failure to strictly follow OSHA requirements or its own safety policies *could* result in a fall does not alone establish a material issue of fact in dispute on the question whether Pro-Tec committed an *intentional* act, i.e., that Pro-Tec knew that a fall was *substantially certain* to occur because of its conduct.

[¶44.]     Affirmed in part and reversed in part.

[¶45.]     JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.